460 S.E.2d 48

**Lawrence A. CARTE, Plaintiff Below, Appellant,**

v.

**Jane L. CLINE, Commissioner of the West Virginia Division of Motor Vehicles, Defendant Below, Appellee.**

No. 22530.

Supreme Court of Appeals of West Virginia.

Submitted May 3, 1995.

Decided June 16, 1995.

Gregory W. Sproles, Breckinridge, Davis, Sproles & Stollings, Summersville, for appellant

Paul E. Jordan, Sr. Asst. Atty. Gen., Charleston, for appellee.

FOX, Judge: [1]

The appellant, Lawrence A. Carte, appeals from the 3 May 1994 order of the Circuit Court of Kanawha County, West Virginia, which upheld the decision by the Commissioner of the West Virginia Division of Motor Vehicles (DMV) to revoke the appellant's driver's license for six months.[2] The appellant challenges his arrest for driving under the influence of alcohol (DUI) and his license revocation on grounds the State Police failed to comply with standard operating procedures when conducting a sobriety checkpoint. The appellant also argues that the use of

sobriety checkpoints by law enforcement officers in West Virginia is a violation of Article III, Section 6 of the West Virginia Constitution, which prohibits unreasonable searches and seizures.[3]

Sobriety checkpoints in West Virginia are operated pursuant to departmental policy known as "The Standard Operating Procedures of the West Virginia Department of Public Safety for Sobriety Checkpoints." These guidelines, effective 1 September 1989, provide, in part:

## SOBRIETY CHECKPOINTS

POLICY:

2.01 Members of the Department of Public Safety, in combination with other department alcohol enforcement efforts, may initiate and establish sobriety checkpoints to deter and detect alcohol and/or drug impaired drivers; and to reduce the number of alcohol related motor vehicle accidents, fatalities, and injuries.

2.02 All sobriety checkpoints will be conducted in such a manner as to minimize any intrusion or inconvenience upon the motoring public and to maximize program effectiveness, enforcement uniformity, and officer/civilian safety.

2.03 Sobriety checkpoints will not be used as a subterfuge to search for other crimes; however, members may initiate appropriate enforcement action for any violation detected while conducting a sobriety checkpoint.

PROCEDURE:

2.04 Initiation, establishment, and operational supervision of sobriety check-

---

1. Pursuant to an administrative order entered by this Court on 18 November 1994, the Honorable Fred L. Fox, II, Judge of the Sixteenth Judicial Circuit, was assigned to sit as a member of the West Virginia Supreme Court of Appeals commencing 1 January 1995 and continuing through 31 March 1995, because of the physical incapacity of Justice W.T. Brotherton, Jr. On 14 February 1995 a subsequent administrative order extended this assignment until further order of said Court.

2. The final order states the appellant is eligible for reinstatement in ninety days upon completion of a Safety and Treatment Program, his payment

of all program costs, and all fees and costs assessed as a result of the revocation hearing.

3. Article III, Section 6 of the West Virginia Constitution states:

The rights of the citizens to be secure in their houses, persons, papers and effects, against unreasonable searches and seizures, shall not be violated. No warrant shall issue except upon probable cause, supported by oath or affirmation, particularly describing the place to be searched, or the person or thing to be seized.

points shall be the responsibility of Department District Commanders or other Company level command officers.

2.05 Prior to initiation of a checkpoint request, the supervisor to be in charge will contact the local prosecuting authority for inclusion in checkpoint planning.

2.06 The supervisor in charge shall select the location of the sobriety checkpoint based upon alcohol/drug related accident statistics, D.U.I. arrest numbers, and/or nighttime single vehicle traffic accidents occurring within a localized area.

2.07 The selected site will be inspected to assure maximum safety and visibility for officers and the motoring public, and must include at a minimum:

(a) Presence of adequate lighting (supplemental illumination may be provided by BATmobiles, portable light generators, or other equipment);

(b) Availability of sufficient space to ensure the safety of motorists and officers, and to provide parking for police vehicles and vehicles of any persons taken into custody;

(c) An alternate route for any driver that wishes to avoid the checkpoint operation.

\* \* \* \* \* \*

2.10 The supervisor in charge shall request permission to conduct a sobriety checkpoint operation from the Company Commander. Such request shall be made in writing and must include the date, time, and location of the checkpoint, and personnel and equipment requirements for operation. The supervisor in charge shall, upon receiving in writing Company approval for a checkpoint, advise the local media of the checkpoint location, date and times, to provide the public with advance notice of the checkpoint operation and to serve as a deterrent to potentially intoxicated drivers.

2.11 Sufficient uniformed personnel and marked vehicles shall be assigned to sobriety checkpoints to display the legitimate police purpose of the stop and to minimize any fear, surprise or apprehension of the motoring public.

(a) Uniformed personnel shall consist at a minimum of the supervisor in charge, BATmobile officer, and six (6) additional officers.

(b) Marked police patrol vehicles will be assigned to the checkpoint and all emergency lighting (blue lights, hazard warning lights, spotlights, and headlights) will be activated during checkpoint operations.

(c) BATmobile(s) will be used to process DUI arrestees unless the services of additional facilities are required.

\* \* \* \* \* \*

2.15 Prior to conducting a checkpoint, the supervisor in charge shall brief all involved personnel as to site location, checkpoint operation procedures, individual officer assignments, and the placement and utilization of safety equipment.

On 6 June 1992, the West Virginia Division of Public Safety established a sobriety checkpoint on Route 60, near Belle, West Virginia. State Police officers stopped all vehicles travelling in either direction. The appellant was stopped in the westbound lane by Corporal S.W. Reedy, who asked to see his driver's license, registration, and proof of insurance. Corporal Reedy said he initially detected an odor of alcohol and saw beer containers in the vehicle. After a brief conversation, he asked the appellant to pull over to the side of the road and exit his vehicle. Corporal Reedy noted the appellant's slurred speech and bloodshot eyes.

Corporal Reedy directed the appellant to perform several field sobriety tests. According to Corporal Reedy, the appellant did not touch heel to toe, stepped off line and lost his balance in the walk-and-turn test, and swayed on the one-leg-stand test. A horizontal gaze nystagmus test of the appellant's eyes indicated he was intoxicated. Corporal Reedy also performed a preliminary breath test, which the appellant failed. The appellant was then arrested for DUI at 10:30 p.m. on 6 June 1992, at which time he was taken to an on-site BATmobile, where a secondary chemical test was administered.[4]

4. The results of this test were not admitted into evidence at the subsequent administrative hear-

A statement of the arresting officer was transmitted to the DMV, as required by W.Va.Code § 17C–5A–1(b).[5] The DMV initiated license revocation proceedings against the appellant. An administrative hearing was held on 30 March 1993, and the commissioner's final order was issued on 4 June 1993.

On appeal from that final order, the appellant now challenges the constitutionality of sobriety checkpoints and argues that failure to prove compliance with standard operating procedures invalidates his arrest and license revocation.

█ For Fourth Amendment purposes, a "seizure" takes place when a vehicle is stopped at a sobriety checkpoint. Such a seizure is subject to constitutional scrutiny to determine its reasonableness.

Increased awareness and heightened concern about the danger of operating a motor vehicle while under the influence of alcohol have thrust the drunk driving menace to the forefront of America's social consciousness. As a result of the increased awareness of traffic fatalities attributable to alcohol consumption, some states have employed roadblocks as devices to detect and to deter drunk driving. Sobriety checkpoints generally entail the slowing and eventual stopping of traffic to check for valid driver's licenses, proper vehicle registration forms, and outward signs of intoxication of the drivers. Stopping an automobile and detaining the occupants at a roadblock constitutes a seizure

under the fourth amendment to the United States Constitution. Under the fourth amendment, a search and seizure is presumptively unreasonable, and the government has the burden of proving the legitimacy of the seizure.[6]

The type of nondiscriminatory checkpoint at issue in this case was approved by this Court under different factual circumstances in *State v. Frisby*, 161 W.Va. 734, 245 S.E.2d 622 (1978). In *Frisby*, where a significant issue was the "tenuous legality of the police's initial detention of the appellant," we explained:

> The weight of authority is that without violating the Fourth Amendment to the *Constitution of the United States* or *W.Va. Constitution*, art. 3, § 6, motorists may be stopped for no other reason than examination of licenses and registrations when such examinations are done on a random basis pursuant to a preconceived plan, *such as the stopping of every car at a check point*, the examination of every car on a given day with a particular letter or number group in the license, or any other nondiscriminatory procedure.

*Id.* 245 S.E.2d at 625 (emphasis added).

Three leading cases illustrate the evolution of the United States Supreme Court's decisions on the issue of checkpoint seizures.

In *United States v. Martinez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), officials operated a fixed immigration roadblock at which all passing vehicles were initially stopped. Officials observed or ques-

---

ing because there was no showing that Corporal Reedy observed the appellant for a required twenty minute waiting period before he administered the secondary chemical test.

**5.** West Virginia Code § 17C–5A–1(b) states:

Any law-enforcement officer arresting a person for an offense described in section two [§ 17C–5–2], article five of this chapter or for an offense described in a municipal ordinance which has the same elements as an offense described in said section two [§ 17C–5–2] of article five, shall take the person's license at the time of arrest and issue a temporary license, to be prescribed by the department of motor vehicles, pending a request for an administrative hearing, and shall report to the commissioner of the department of motor vehicles by written statement within forty-eight

hours the name and address of the person so arrested. Such report shall include the specific offense with which the person is charged, and, if applicable, a copy of the results of any secondary tests of blood, breath or urine. The signing of the statement required to be signed by this subsection shall constitute an oath or affirmation by the person signing such statement that the statements contained therein are true and that any copy filed is a true copy. Such statement shall contain upon its face a warning to the officer signing that to willfully sign a statement containing false information concerning any matter or thing, material or not material, is false swearing and is a misdemeanor.

**6.** Note, *The Constitutionality of Sobriety Checkpoints*, 43 Wash. & Lee L.Rev. 1469–70 (1986).

tioned the occupants briefly. Automobiles were detained only upon a finding of probable cause or the consent of the driver. The Court concluded that the seizure incident to a fixed roadblock satisfied the reasonableness standard of the Fourth Amendment as long as the stop remained minimally intrusive and was operated pursuant to narrow guidelines which limited the discretionary authority of the officials conducting the stops. *Martinez–Fuerte,* 428 U.S. at 566–67, 96 S.Ct. at 3086–87.

The constitutionality of random, or roving, automobile stops was addressed by the United States Supreme Court in *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). In *Prouse,* a patrolman randomly stopped a car to check the driver's license and car registration. The patrolman had no reason for stopping the car: he had not observed any traffic violations or suspicious activity, nor was he acting according to any standards, guidelines, or procedures. However, the patrolman saw marijuana in plain view on the floor of the car, and the driver was subsequently indicted for illegal possession of a controlled substance.

The United States Supreme Court said the stop was unreasonable and in violation of the Fourth Amendment for two reasons. First, the Court was concerned about the police officer's "unbridled discretion" in conducting the spot stop. Second, the Court was not persuaded that any slight benefits to highway safety justified the intrusion on Fourth Amendment rights: "The marginal contribution to roadway safety possibly resulting from a system of spot checks cannot justify subjecting every vehicle on the roads to a seizure ... at the unbridled discretion of law enforcement officers." *Prouse,* 440 U.S. at 661, 99 S.Ct. at 1400. The Court concluded:

> ... except in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment. *This holding does not preclude the State of Delaware or other states from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion.* Questioning of all oncoming traffic at roadblock-type stops is one possible alternative. We hold only that persons in automobiles on public roadways may not for that reason alone have their travel and privacy interfered with at the unbridled discretion of police officers. (Emphasis added.)

*Id.* at 664, 99 S.Ct. at 1401.

The Court did not have the occasion to discuss the constitutionality of one of those alternatives—the questioning of all oncoming traffic at roadblock-type stops—until the issue was raised eleven years later in *Michigan Department of State Police v. Sitz,* 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990). In *Sitz,* the director of the Michigan State Police appointed a sobriety checkpoint advisory committee to create guidelines setting forth procedures governing checkpoint operations, site selection, and publicity. The United States Supreme Court declared Michigan's highway sobriety checkpoint program constitutional, finding it consistent with the Fourth Amendment. The Court explained:

> In *Delaware v. Prouse, supra,* we disapproved random stops made by Delaware Highway Patrol officers in an effort to apprehend unlicensed drivers and unsafe vehicles. We observed that *no* empirical evidence indicated that such stops would be an effective means of promoting roadway safety and said that "[i]t seems common sense that the percentage of all drivers on the road who are driving without a license is very small and that the number of licensed drivers who will be stopped in order to find one unlicensed operator will be large indeed." *Id.,* 440 U.S. at 659–660, 99 S.Ct., at 1399. We observed that the random stops involved the "kind of standardless and unconstrained discretion [which] is the evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed, at least to some extent." *Id.,* at 661, 99 S.Ct., at 1400. We went on

to state that our holding did not "cast doubt on the permissibility of roadside truck weighstations and inspection checkpoints, at which some vehicles may be subject to further detention for safety and regulatory inspection that are others." *Id.,* at 663, n. 26, 99 S.Ct., at 1401, n. 26.

Unlike *Prouse,* this case involves neither a complete absence of empirical data nor a challenge to random highway stops.

*Sitz,* 496 U.S. at 454, 110 S.Ct. at 2487.

The *Sitz* Court concluded the brief stop at the roadblock was only a slight intrusion on motorists and was not an unreasonable Fourth Amendment seizure: "... the balance of the State's interest in preventing drunken driving, the extent to which this system can reasonably be said to advance that interest, and the degree of intrusion upon individual motorists who are briefly stopped, weighs in favor of the state program." *Id.* at 455, 110 S.Ct. at 2488.

■ This Court is in agreement with the United States Supreme Court's position that a seizure incident to a sobriety checkpoint is a reasonable law enforcement practice under the Fourth Amendment. Moreover, we do not find sobriety checkpoints violative of any provisions of the West Virginia Constitution.[7] Sobriety checkpoint roadblocks are constitutional when conducted within predetermined operational guidelines which minimize the intrusion on the individual and mitigate the discretion vested in police officers at the scene. However, in the case now before us, the evidentiary record is incomplete, and there is no basis for determining whether the State Police complied with the operational guidelines. Therefore, we now address the more narrow issue presented in this appeal.

The obvious and most critical inquiry in a license revocation proceeding is whether the person charged with DUI was actually legally intoxicated.[8] West Virginia is one of a majority of the states which has a complete system of administrative license revocation. "Administrative license revocation (hereinafter ALR), also referred to as 'administrative per se' or 'summary suspension,' establishes an administrative process, independent of the criminal justice system, whereby the driving privileges of an intoxicated motorist may be immediately revoked. Under the ALR scheme, law enforcement officers, as agents of the Department of Motor Vehicles, are authorized to seize the driver's license of a motorist who either fails a chemical test or who refuses to submit to a chemical test. Upon seizure, the motorist receives a temporary license valid for only a short period of time and is given an opportunity to appeal the revocation to the Department of Motor Vehicles." [9]

At the 30 March 1993 administrative hearing in this case, the arresting officer, Corporal Reedy, explained his initial observations of the appellant and the subsequent actions which resulted in the appellant being arrested for DUI. However, Corporal Reedy was unable to fully testify about whether operational guidelines for setting up the sobriety checkpoint were followed. The appellee disputes the appellant's claim that the State Police violated their own standard operating procedures, and argues a review of Corporal Reedy's testimony simply indicates he relied upon his superior officers to insure the underlying procedures were carried out.

It appears the appellant is asking this Court to recognize a foundation requirement which would demand that arresting officers be prepared to testify with specificity about

---

7. The United States Supreme Court remanded the *Sitz* case to the Court of Appeals of Michigan, which then decided that while sobriety checkpoints are permitted by the Fourth Amendment, "the indiscriminate suspicionless stopping of motor vehicles" nonetheless violates art. 1, § 11 of Michigan's State Constitution. *Sitz v. Department of State Police,* 193 Mich.App. 690, 485 N.W.2d 135, 139 (1992).

8. West Virginia Code § 17C–5A–2(d) (1991) states:

> (d) The principal question at such hearing shall be whether the person did drive a motor vehicle while under the influence of alcohol, controlled substances or drugs, or did drive a motor vehicle while having an alcohol concentration in his blood of ten hundredths of one percent or more, by weight, or did refuse to submit to the designated secondary chemical test.

9. Note, *Drunk Drivers Beware! Nebraska Adopts Administrative License Revocation,* 72 Neb.L.Rev. 296, 297–98 (1993).

sobriety checkpoint operational procedures. We decline to go this far, however, because such a requirement is not only unnecessary, but also unnecessarily burdensome, to these types of informal administrative proceedings. The arresting officer is often not represented by counsel and is usually the sole witness called to testify at these hearings.

 The initiation and operation of a sobriety checkpoint requires cooperation and coordination between several parties. Each police officer will not necessarily be involved with or privy to the details of the decision-making process. Consequently, it is imprudent to suggest that an arresting officer must be aware of every decision made by those responsible for setting up and conducting a sobriety checkpoint. In the opinion of this Court, a more viable and preferable alternative is to require a person who wishes to challenge official compliance with and adherence to sobriety checkpoint operational guidelines to give written notice of that intent to the commissioner of motor vehicles prior to the administrative revocation hearing which is conducted pursuant to W.Va. Code § 17C–5A–2.[10] The State is thereby afforded an opportunity to have the appropriate law enforcement officers present testimony or other evidence of compliance with standard operating procedures when noncompliance is alleged by the person whose license has been revoked.

For the foregoing reasons, we reverse the 4 June 1993 final order of the Circuit Court of Kanawha County and remand this case to the administrative level for further evidentiary proceedings to determine whether this sobriety checkpoint comported with constitutional standards.

Reversed and remanded.

10. There is currently no statutory provision which addresses giving prior notice of specific issues to be raised at a revocation hearing. However, we note that an analogous situation is addressed in W.Va.Code § 17C–5A–2(d) (1991), which permits the commissioner to propose a legislative rule in compliance with the provisions of W.Va.Code § 29A–3–1 *et seq.* which may provide that:

 ... if a person accused of driving a motor vehicle while under the influence of alcohol, controlled substances ·or drugs, or accused of

BROTHERTON and RECHT, JJ., did not participate.

MILLER, Retired J., and FOX, J., sitting by temporary assignment.

driving a motor vehicle while having an alcohol concentration in his blood of ten hundredths of one percent or more, by weight, intends to challenge the results of any secondary chemical test of blood, breath or urine, or intends to cross-examine the individual or individuals who administered the test or performed the chemical analysis, he shall, within an appropriate period of time prior to the hearing, notify the commissioner in writing of such intention.