536 S.E.2d 110

STATE of West Virginia Plaintiff below, Appellee,

v.

Terry Lee LEGG, Defendant below, Appellant.

No. 26732.

Supreme Court of Appeals of West Virginia.

Submitted March 22, 2000.

Decided May 4, 2000.

Timothy R. Conaway, Esq., Madison, West Virginia, Attorney for Appellant.

Darrell V. McGraw, Jr., Attorney General, Daynus Jividen, Senior Assistant Attorney General, Charleston, West Virginia, Attorneys for the Appellee.

STARCHER, Justice:

The question presented in this case is whether a conservation officer's decision to conduct a game-kill survey to detect violations of hunting laws is sufficient to justify the conservation officer's random stop and search of a vehicle on a public roadway. We hold that it is not.

## I.

### Facts & Background

On November 24, 1998, the second day of deer rifle season, two conservation officers with the West Virginia Department of Natural Resources were dispatched to the Farley Branch area of Boone County, West Virginia. Lieutenant Charles W. Schollar and Officer Wayne Elam were ordered to "work the area" to ensure that hunters carried hunting licenses, and to find if hunters were illegally killing deer. The officers alleged that they had received "two complaints from those areas in the last couple of years of illegal taking of deer and road hunting" and other such violations of hunting laws and regulations.

In order to "work the area" as they were ordered, the conservation officers proceeded to conduct a "game-kill survey." This "survey" consisted of the conservation officers stopping any vehicle on the road, and checking to see if the occupants of the vehicle carried any weapons, had any game, and if so whether they had a hunting license.[1] The officers would also look for any other criminal violations as part of the "survey." It was the conservation officers' understanding that they could stop any person in the woods, and any vehicle on the road, with no probable cause to believe a crime had been committed and for no reason other than to conduct a "game-kill survey."[2]

---

1. The conservation officers testified that they stopped between 14 and 18 vehicles on November 24, 1998. Although the officers contended they were conducting a "game-kill survey," no records were kept of the vehicles stopped. Additionally, the officers issued no citations to any other individuals for violating hunting laws.

2. On March 26, 1999, the circuit court held a hearing to consider the admissibility of evidence seized from the defendant's vehicle. Lieutenant

After driving around in the Farley Branch area for approximately an hour-and-a-half, shortly after nightfall at about 6:00 p.m., the conservation officers saw the headlights of a vehicle coming towards them on a narrow section of the road. The vehicle, driven by defendant Terry Lee Legg, slowed and moved to the left side of the conservation officers' vehicle to pass. The conservation officers pulled their vehicle in front of the defendant's car, nose-to-nose, and turned on their blue lights. The defendant stopped his vehicle.[3]

As the conservation officers walked up to the defendant's car, the defendant opened the door of his car and got out. The conservation officers testified that as they approached the defendant, they could smell marijuana. Looking inside the defendant's car, the officers saw what they believed to be a partially smoked marijuana cigarette, a "marijuana roach" in the ashtray, and another marijuana cigarette on the floor board. The conservation officers asked the defendant if he had been hunting, and the defendant responded that he had not.[4]

The conservation officers then asked for permission to look in the trunk of the defendant's vehicle. The defendant consented, and opened the trunk. Upon looking in the defendant's trunk, the conservation officers saw no weapons, blood, animal hair or game species. Instead, a search of the trunk revealed a spare tire, a toolbox "containing odds and ends," and two black plastic bags. Lieutenant Schollar touched one of the bags, and felt what seemed to be a five-gallon bucket. Lieutenant Schollar asked the defendant what was in the buckets inside the trash bags; the defendant replied, "marijuana."

The conservation officers opened the trash bags and discovered nearly six pounds of marijuana packed inside five-gallon buckets. The conservation officers then placed the defendant under arrest for possessing marijuana with intent to deliver.[5]

On February 18, 1999, counsel for the defendant filed a motion in the circuit court

Schollar, when questioned by the Boone County prosecuting attorney, testified as follows:

Q. So describe your interactions with folks that you encountered and conducted game kill surveys on?

A. Well, when we go into an area such as this area we looked it over. We look for vehicles that are parked and see if there is anyone who is close enough that we can check them. And if we approach the vehicles on the road we will stop them and check and see if they have any game or any weapons and hunting licenses if they have been hunting.

Q. Is it your understanding that you are allowed to stop people for game kill without probable cause and that you are entitled to stop any vehicle that is up in the woods to conduct a game kill survey?

A. Yes, we have the authority to stop them to determine whether they have been hunting or not or are transporting game.

3. The totality of Lieutenant Schollar's testimony regarding the reasoning behind the officers' stop of the defendant's vehicle is as follows:

A. We had crossed over the mountain from what I presumed to be actually Farley Branch into the branch that goes down into Twilight. We weren't very far from coming off of the grade and onto the flat. We saw the headlights of a vehicle coming obviously we determined we were going to stop it close enough to the time and it was shortly after dark and the hunters were still moving a lot.

We got down close to the vehicle. The subject vehicle had pulled over to the left, our left. It gets a little narrow in there. And we got right up to the vehicle and I turned on my blue lights and we actually did a vehicle check.

4. The conservation officers testified that when they questioned the defendant, he "was real high." For reasons not apparent from the record, the defendant was not charged with driving under the influence of an intoxicating controlled substance. See W.Va.Code, 17C–5–2 [1996].

5. The West Virginia Code defines marijuana as a "Schedule I" controlled substance. See W.Va. Code, 60A–2–204(d) [1991]. The penalty for possessing a Schedule I controlled substance with an intent to deliver is 1 to 15 years in the state penitentiary, or a fine up to $25,000, or both. W.Va.Code, 60A–4–401 (a) [1983] states, in part:

Except as authorized by this chapter, it is unlawful for any person to manufacture, deliver, or possess with intent to manufacture or deliver, a controlled substance.

Any person who violates this subsection with respect to: (i) A controlled substance classified in Schedule I ... which is a narcotic drug, is guilty of a felony, and, upon conviction, may be imprisoned in the penitentiary for not less than one year nor more than fifteen years, or fined not more than twenty-five thousand dollars, or both; ...

seeking to suppress the marijuana evidence discovered by the conservation officers in their search of the defendant's car. The defendant contended that the evidence was acquired by the State as the result of an unlawful search and seizure of his vehicle, and requested that the circuit court prohibit the use of the marijuana or any testimony regarding the controlled substance in a subsequent trial.

Additionally, pursuant to the West Virginia Freedom of Information Act,[6] counsel for the defendant mailed a letter to the Department of Natural Resources requesting copies of any written regulations or instructions regarding game-kill surveys conducted by conservation officers. The Department responded to the request by indicating that there were no such written directives.

The circuit court conducted a suppression hearing on the defendant's motion on March 26, 1999, and heard testimony from Lieutenant Schollar regarding the conservation officers' decision to stop the defendant's vehicle. By an order dated March 30, 1999, the circuit court ruled that the conservation officers' stop of the defendant was constitutional, and that the evidence discovered in the defendant's vehicle would be admissible against the defendant at trial. The circuit court

found that the stop of the defendant's vehicle to conduct a game-kill survey was reasonable, and found that the statute authorizing game-kill surveys, *W.Va.Code*, 20–7–4(5) [1994], was constitutional as written and as applied by the conservation officers.

In response to the circuit court's ruling, the defendant entered into a "conditional" plea agreement with the Boone County prosecuting attorney. The plea agreement, authorized by Rule 11(a)(2) of the *West Virginia Rules of Criminal Procedure* [1995], allowed the defendant to plead guilty to the offense of possession of a controlled substance with intent to deliver, but specifically reserved the defendant's right to appeal the question of whether the search of his car was constitutional.[7]

The defendant now appeals the circuit court's March 30, 1999 ruling denying the motion to suppress.

## II.

### Standard of Review

The parties in this case dispute the circuit court's rulings regarding the defendant's motion to suppress certain evidence. In examining a challenge to a circuit court's

---

**6.** The West Virginia Freedom of Information Act may be found at *W.Va.Code*, 29B–1–1 to –7. The Act details the procedures which citizens may use to obtain records from State government agencies.

**7.** When a defendant unconditionally and voluntarily pleads guilty to an offense, the defendant generally waives nonjurisdictional objections to a circuit court's rulings, and therefore cannot appeal those questions to a higher court. Claims of nonjurisdictional defects in the proceedings, such as unlawfully or unconstitutionally obtained evidence or illegal detention, generally will not survive a plea bargain. *See, e.g., Tollett v. Henderson,* 411 U.S. 258, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973); *Losh v. McKenzie,* 166 W.Va. 762, 277 S.E.2d 606 (1981).

However, a "conditional" plea under Rule 11(a)(2) of the *West Virginia Rules of Criminal Procedure* allows the defendant to plead guilty, but preserve questions for appeal. If the defendant prevails on appeal, and an appellate court rules for the defendant, the defendant may withdraw the guilty plea and proceed to trial. "By invoking Rule 11(a)(2), the parties not only eliminated the need for a protracted trial, but paid the

ultimate respect to limited judicial resources and judicial economy." *State v. Lilly,* 194 W.Va. 595, 605, 461 S.E.2d 101, 112 (1995) (Cleckley, J., concurring).

Rule 11(a)(2) states:

Conditional pleas.—With the approval of the court and the consent of the state, a defendant may enter a conditional plea of guilty ..., reserving in writing the right, on appeal from the judgment, to review of the adverse determination of any specified pretrial motion. A defendant who prevails on appeal shall be allowed to withdraw the plea.

In the instant case, defendant Legg reserved in writing the following issue for this Court to consider:

[T]his plea is conditioned upon the Supreme Court of Appeals ... affirming the Circuit Court's ruling of 26 March 1999; said ruling having refused defendant's motion to suppress the marihuana seized herein on the ground that it was obtained in violation of the proscription against unreasonable searches and seizures contained in the Fourth Amendment to the United States Constitution and Article III, Sec. 6, of the West Virginia Constitution.

ruling in a suppression hearing, we are guided by the following standard of review:

> On appeal, legal conclusions made with regard to suppression determinations are reviewed de novo. Factual determinations upon which these legal conclusions are based are reviewed under the clearly erroneous standard. In addition, factual findings based, at least in part, on determinations of witness credibility are accorded great deference.

Syllabus Point 3, *State v. Stuart,* 192 W.Va. 428, 452 S.E.2d 886 (1994).

In the instant case, the State contends that conservation officers are legally empowered by *W.Va.Code,* 20–7–4 [1994] to stop any individual or vehicle at will and at random to conduct "game-kill surveys" to determine if any hunting or weapons violations have been committed. In response, the defendant contends that stopping and searching individuals and their vehicles, without reasonable suspicion that a crime has occurred or is about to occur, is a violation of constitutional protections against warrantless searches and seizures.

In its March 30, 1999 order, the circuit court found that the conservation officers' stop of the defendant's vehicle was reasonable under the circumstances. The circuit court also determined that the game-kill survey statute was not unconstitutional, as written or as applied by conservation officers.

■ Therefore, because the circuit court's ruling on the suppression issues raised by the defendant were legal determinations, we review the circuit court's order *de novo.*[8]

### III.

### *Discussion*

### A.

### *Legality of the Stop of the Defendant's Vehicle*

The statute at issue in this case is *W.Va. Code,* 20–7–4 [1994], which lists the various powers and duties given to conservation officers by the West Virginia Legislature. The portions of the statute relevant to this case state:

> The authority, powers and duties of the conservation officers shall be statewide and they shall have authority to: ...

> (5) Require the operator of any motor vehicle or other conveyance on or about the public highways or roadways, or in or near the fields and streams of this state, to stop for the purpose of allowing such officers to conduct game-kill surveys; ...

■ The defendant argues that the conservation officers' stop of his vehicle pursuant to *W.Va.Code,* 20–7–4(5) [1994] violated constitutional protections against unreasonable searches and seizures found in the Fourth Amendment to the *United States Constitution* and Article III, section 6 of the *West Virginia Constitution.* The Fourth Amendment states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no Warrants shall issue but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Similarly, Article III, section 6 of our State *Constitution* provides:

> The rights of the citizens to be secure in their houses, persons, papers and effects, against unreasonable searches and seizures, shall not be violated. No warrant shall issue except upon probable cause, supported by oath or affirmation, particularly describing the place to be searched, or the person or thing to be seized.

These two constitutional protections are implicated because stopping an automobile and detaining its occupants constitutes a "seizure" within the meaning of these provisions, even though the purpose of the stop is limited and the resulting detention is quite brief. *See, e.g., Carte v. Cline,* 194 W.Va. 233, 236, 460 S.E.2d 48, 51 (1995) ("For Fourth Amendment purposes, a 'seizure' takes place when a vehicle is stopped at a sobriety check-

---

**8.** The term *"de novo"* means "anew." In other words, we review the circuit court's ruling in the same way that the circuit court made the ruling, as though the ruling were never made.

point."). *See also, Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660, 667 (1979); *Michigan Dept. of State Police v. Sitz,* 496 U.S. 444, 450, 110 S.Ct. 2481, 2485, 110 L.Ed.2d 412, 420 (1990).

The conservation officers in the instant case did not seek a warrant before stopping and searching the defendant's vehicle. Accordingly, our analysis must focus on whether the stop of the defendant for purposes of conducting a game-kill survey under *W.Va. Code,* 20-7-4(5) was an "unreasonable" search or seizure that was constitutionally prohibited.

■ The purpose of these constitutional provisions is to impose a standard of "reasonableness" upon the exercise of discretion by government officials, including law enforcement officers, so as to " " 'safeguard the privacy and security of individuals against arbitrary invasions [by governmental officials]. . . .' " " *Delaware v. Prouse,* 440 U.S. at 653–54, 99 S.Ct. at 1396, 59 L.Ed.2d at 667, *quoting Marshall v. Barlow's, Inc.,* 436 U.S. 307, 312, 98 S.Ct. 1816, 1820, 56 L.Ed.2d 305, 311 (1978), *quoting Camara v. Municipal Court,* 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930, 935 (1967). In other words, both the State and Federal *Constitutions* "assure that the individual's reasonable expectation of privacy is not 'subject to the discretion of the official in the field.' " *Delaware v. Prouse,* 440 U.S. at 655, 99 S.Ct. at 1397, 59 L.Ed.2d at 668, *quoting Camara v. Municipal Court,* 387 U.S. at 532, 87 S.Ct. at 1733, 18 L.Ed.2d at 937 (1967).

■ In *State v. Stuart,* 192 W.Va. 428, 452 S.E.2d 886 (1994), this Court discussed the guidelines that police officers must follow in order to make a constitutionally proper stop of a vehicle in order to conduct an investigation. We stated, at Syllabus Point 1, that:

Police officers may stop a vehicle to investigate if they have an articulable reasonable suspicion that the vehicle is subject to seizure or a person in the vehicle has committed, is committing, or is about to commit a crime. To the extent *State v. Meadows,* 170 W.Va. 191, 292 S.E.2d 50 (1982), holds otherwise, it is overruled.

In other words, law enforcement officers may not randomly stop individual vehicles to determine if a crime has been, is being, or may be committed. An officer may not stop a vehicle on the basis of "nothing more substantial than inarticulate hunches. . . ." *Terry v. Ohio,* 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, 906 (1968). The officer must be able to identify specific facts and evidence giving rise to a reasonable suspicion that a crime is, has been, or will be committed before the officer may stop the vehicle to conduct an investigation of the suspected crime. This constitutional rule applies to all law enforcement officers, from city police officers to state troopers to conservation officers employed by the Department of Natural Resources.

■ When this Court or a circuit court examines the evidence presented by a law enforcement officer to support his or her reasonable suspicion, the evidence must be examined together, as a whole. We stated in Syllabus Point 2 of *State v. Stuart, supra:*

When evaluating whether or not particular facts establish reasonable suspicion, one must examine the totality of the circumstances, which includes both the quantity and quality of the information known by the police.

For example, in *State v. Stuart,* we concluded that the innocuous fact that a vehicle was driving at 25 miles per hour in a 35 miles per hour zone on a relatively straight road at 1:00 a.m. was insufficient evidence, standing alone, to establish a reasonable suspicion to stop the vehicle. However, when that evidence was combined with an anonymous telephone call to a police dispatcher reporting that a drunk driver was in the area driving a Mercury Grand Marquis with a particular West Virginia license plate number, the totality of the circumstances gave rise to a reasonable suspicion that a crime was being committed, and the vehicle could be stopped to further investigate whether the driver was intoxicated.

■ In the case now before the Court, defendant Legg insists that the stop of his vehicle by conservation officers was unconstitutional, applying the reasonable suspicion

standards set forth in *State v. Stuart*. We agree.

The circuit court, in its March 30, 1999 order, found the following facts supported the conclusion that the conservation officers' actions as law enforcement officers were reasonable:

> ... that there had been numerous reports to DNR of game law violations in this area; that this stop occurred in a remote, nonresidential area of Boone County accessible only by dirt roads; that this stop was in an area typically associated with heavy hunting activity; that the stop occurred during one of the heaviest times for the hunting season and at the heaviest time of the day for finding hunters.

The sum of the conservation officers' testimony is this: they had received reports of illegal hunting and weapons violations, possibly only two in the last 2 years, occurring in the Farley Branch area of Boone County. Based upon this report, the officers decided to randomly stop and search vehicles. The officers chose to stop the defendant's vehicle when they saw his headlights, on the reasoning that many hunters (legal or illegal) tend to pack up and drive home after sundown.

After carefully examining the record, we find these facts were clearly insufficient to establish reasonable suspicion to stop the defendant. Law enforcement officers cannot stop a vehicle and detain its occupants on a random, capricious basis. We cannot conceive of any legitimate basis upon which a conservation or other law enforcement officer can decide that randomly stopping one driver for a "game-kill survey" will be more productive, and reveal more violations of the law, than stopping any other driver. "This kind of standardless and unconstrained discretion is the evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed, at least to some extent." *Delaware v. Prouse*, 440 U.S. at 661, 99 S.Ct. at 1400, 59 L.Ed.2d at 672.

We therefore find that the circuit court erred in its conclusion, and we find that the stop of the defendants' vehicle by the conservation officers to conduct a game-kill survey was unreasonable. The conservation officers

identified no set of facts to establish that *this* defendant acted in a manner that would raise a reasonable suspicion that a law or regulation was being broken. Instead, the conservation officers patrolled what they believed to be a "high crime" area, and randomly stopped vehicles to determine if the occupants of the vehicles were committing any crimes. Such unbridled use of authority by a law enforcement officer is precisely what the State and Federal *Constitutions* intended to prohibit. We therefore reverse the circuit court's order denying the defendant's motion to suppress the evidence discovered during the conservation officers' search of the defendant's vehicle.

In reaching our conclusion today, we note that other courts have also found random stops by conservation officers to search for violations of hunting laws to be unconstitutional, in the absence of an articulable, reasonable suspicion. *See, e.g., People v. Coca*, 829 P.2d 385 (Colo.1992); *State v. Creech*, 111 N.M. 490, 806 P.2d 1080 (Ct.App.1991); *United States v. Munoz*, 701 F.2d 1293 (9th Cir.1983); *State v. Tourtillott*, 289 Or. 845, 618 P.2d 423 (1980). *See also*, Wayne R. LaFave, 4 *Search and Seizure: A Treatise on the Fourth Amendment, Third Edition* § 10.8(e) [West, 1996].

**B.**

*Constitutionality of W.Va.Code, 20-7-4(5) [1994]*

The defendant in this case urges us to go one step further, beyond our holding that the stop and search of the defendant's vehicle violated constitutional proscriptions. The defendant argues that we should also find that the statute giving conservation officers the authority to conduct game-kill surveys, *W.Va.Code*, 20-4-7(5) [1994], is unconstitutional, because as the statute is written, it permits conservation officers to conduct constitutionally unlawful warrantless stops and detentions of citizens. However, we reject the defendant's suggestion.

We have repeatedly and unequivocally stated that we will not find a statute to be unconstitutional unless its constitutional

defect appears beyond any reasonable doubt. Our standard for reviewing the constitutionality of statutes was set forth in Syllabus Point 1 of *State ex rel. Appalachian Power Company v. Gainer*, 149 W.Va. 740, 143 S.E.2d 351 (1965), where we stated:

> In considering the constitutionality of a legislative enactment, courts must exercise due restraint, in recognition of the principle of the separation of powers in government among the judicial, legislative and executive branches. Every reasonable construction must be resorted to by the courts in order to sustain constitutionality, and any reasonable doubt must be resolved in favor of the constitutionality of the legislative enactment in question. Courts are not concerned with questions relating to legislative policy. The general powers of the legislature, within constitutional limits, are almost plenary. In considering the constitutionality of an act of the legislature, the negation of legislative power must appear beyond reasonable doubt.

*In accord*, Syllabus Point 1, *West Virginia Trust Fund, Inc. v. Bailey*, 199 W.Va. 463, 485 S.E.2d 407 (1997); Syllabus Point 1, *State ex rel. Blankenship v. Richardson*, 196 W.Va. 726, 474 S.E.2d 906 (1996); Syllabus Point 4, *State ex rel. W.Va. Housing Development Fund v. Copenhaver*, 153 W.Va. 636, 171 S.E.2d 545 (1969).

 Additionally, this Court presumes that laws passed by the Legislature are constitutional, and we will interpret legislation in any reasonable way which will sustain its constitutionality. Syllabus Point 2, *State ex rel. Frazier v. Meadows*, 193 W.Va. 20, 454 S.E.2d 65 (1994). "Wherever an act of the Legislature can be so construed and applied as to avoid a conflict with the Constitution, and give it the force of law, such construction will be adopted by the courts." Syllabus Point 3, *Slack v. Jacob*, 8 W.Va. 612 (1875). *In accord*, Syllabus Point 1, *Perilli v. Board of Educ.*, 182 W.Va. 261, 387 S.E.2d 315 (W.Va.1989). And, of course, no act of the Legislature can authorize or validate a violation of the *United States Constitution* or the *West Virginia Constitution. See, e.g. Almeida–Sanchez v. United States*, 413 U.S. 266, 272, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596, 602 (1973).

The law under scrutiny in this case is *W.Va.Code*, 20–7–4(5) [1994]. This statute authorizes conservation officers to "[r]equire the operator of any motor vehicle ... on or about the public highways or roadways ... to stop for the purpose of allowing such officers to conduct game-kill surveys." Conservation officers appear to have interpreted this statute to mean that they can stop any vehicle and search the vehicle for weapons, game, and any hunting licenses if game is found. More importantly, conservation officers are conducting game-kill surveys with the specific goal of finding violations of the laws of the State of West Virginia.[9] Game-kill surveys are not being conducted to count the number of animals killed during a hunting season; the survey authorization is used as a pretext to stop vehicles and search the vehicles for any violations of the law.

9. Lieutenant Schollar testified, when questioned by counsel for the defendant, as follows:

> Q. Lt [sic], your intent when you went out that day was to see if you catch people who were acting in violation of the West Virginia Game Laws?
> A. Yes, sir. My intent every day is to enforce the laws of the State....
> Q. I understand. But you in stopping those vehicles that you stopped you were intending to see if they [sic] people you stopped had broken the game laws of the State of West Virginia?
> A. Yes, sir.
> Q. ... What sort of game law do you typically push ... when you go and catch people involving game laws.
> A. Catch them for illegal game, after the fact that they have been hunting all day and have

> not secured a license to do so. They will still have their weapons loaded in the vehicle. At that time in the evening they will have uncased full loaded firearms in the vehicle which is a violation of the Code....
> Q. I've got transporting illegal game. Uncased firearms and hunting without a license. Is there anything else that you check for?
> A. Primarily that is what are looking for ... But we also deal with all other violations that we run into [during] our survey.

Lieutenant Schollar's testimony reveals that conservation officers are using game-kill surveys as a pretext to stop and conduct a generalized search of vehicles for any violations of criminal statutes. It is against this type of random, unrestrained intrusion on the individual which the State and Federal *Constitutions* intended to protect.

After examining the statute, we conclude that *W.Va.Code,* 20–7–4(5) [1994] properly empowers a conservation officer to stop vehicles to conduct a game-kill survey. However, the statute does not permit the conservation officer to act outside the restraints imposed by the *United States* and *West Virginia Constitutions.* All law enforcement officers, including conservation officers, are charged with upholding the law and defending the guarantees of liberty provided by the State and Federal *Constitutions.* While an individual officer may stray across constitutional boundaries, no law passed by the Legislature can make that action constitutional. In other words, *W.Va.Code,* 20–7–4(5) [1994] merely authorizes a conservation officer to stop vehicles to conduct game-kill surveys; the statute does not authorize a conservation officer to make such a stop in a constitutionally unlawful manner.

■ We therefore hold that a conservation officer may constitutionally conduct a stop of a vehicle for purposes of allowing the officer to conduct a game-kill survey pursuant to *W.Va.Code,* 20–4–7(5) [1994], or for other law enforcement purposes, so long as the officer has an articulable, reasonable suspicion that the vehicle is subject to seizure or a person in the vehicle has committed, is

committing, or is about to commit a crime.[10] Because a conservation officer could conduct a stop of a vehicle to perform a game-kill survey within the bounds of the State and Federal *Constitutions,* we cannot conclude beyond a reasonable doubt that the statute is unconstitutional.[11]

IV.

*Conclusion*

For the foregoing reasons, we find that the Circuit Court of Boone County erred in denying the defendant's motion to suppress. We therefore reverse the order of the circuit court denying the motion, and remand this case for further proceedings.

Reversed and Remanded.

Justice McGRAW dissents.

10. The defendant in this case disputes the power exercised by conservation officers to conduct game-kill surveys by stopping vehicles pursuant to *W.Va.Code,* 20–7–4(5) [1994]. However, although not discussed by the defendant, *W.Va. Code,* 20–7–4(3) appears to allow conservation officers to conduct similar investigations of vehicles:

> The authority, powers and duties of the conservation officers shall be statewide and they shall have authority to:
>
> . . . . .
>
> (3) Search and examine, in the manner provided by law, any boat, vehicle, automobile, conveyance, express or railroad car, fish box, fish bucket or creel, game bag or game coat, or any other place in which hunting and fishing paraphernalia, wild animals, wild birds, fish, amphibians or other forms of aquatic life could be concealed, packed or conveyed whenever they have reason to believe that they would thereby secure or discover evidence of the violation of any provisions of this chapter; ...

This statute specifically provides that the search and examination of any vehicle or automobile must be conducted "in the manner provided by

law." We perceive this language to similarly mean that conservation officers must act within the bounds of the Fourth Amendment to the *United States Constitution* and Article III, section 6 of the *West Virginia Constitution* when conducting searches of persons, places or things.

11. We were not called upon to directly explore the constitutional implications of the possible use of game-kill checkpoints or roadblocks. However, we note that in the analogous context of so-called "sobriety checkpoints," we have held that such "roadblocks are constitutional when conducted within predetermined operational guidelines which minimize the intrusion on the individual and mitigate the discretion vested in police officers at the scene." *Carte v. Cline,* 194 W.Va. at 238, 460 S.E.2d at 53. The defendant sought through the Freedom of Information Act any operational guidelines used by the Department of Natural Resources in conducting game-kill surveys. Unfortunately, the Department indicated that none exist. In this regard, operationalization of *W.Va.Code,* 20–4–7(5) [1994] would suggest that the Department of Natural Resources promulgate policies and procedures that satisfy constitutional protections against unreasonable searches and seizures.