687 S.E.2d 391

**STATE of West Virginia, Appellee,**

v.

**Linda S. SIGLER a/k/a Linda S. Mullins, Appellant.**

**and**

**State of West Virginia, Appellee,**

v.

**John R. Mullens, Appellant.**

**Nos. 34741, 34584.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 22, 2009.

Decided Nov. 25, 2009.

---

John M. (Jack) Thompson, Jr., Esquire, Oak Hill, WV, for Appellants.

Brian Parsons, Esquire, Assistant Prosecuting Attorney, Fayetteville, WV, for Appellee.

BENJAMIN, Chief Justice:

These consolidated appeals relating to the propriety of administrative or safety roadblocks are before the Court upon final judgments of the Fayette County Circuit Court. Linda S. Sigler, also known as Linda S. Mullins (hereinafter referred to as appellant Sigler), appeals her conviction for third offense driving under the influence. John R. Mullens (hereinafter referred to as appellant Mullens) appeals the circuit court affirmation of his magistrate court conviction for first offense driving under the influence. The appeals were consolidated by this Court on December 30, 2008.

After carefully reviewing the briefs, the arguments of the parties, the legal authority cited and the record presented for consideration, we reverse the circuit court's rulings.

**I.**

**PROCEDURAL BACKGROUND AND FACTS**

**A. Linda S. Sigler**

On January 27, 2008, at or near 3:22 a.m., Linda S. Sigler, also known as Linda S. Mullins (hereinafter referred to as the appellant Sigler), was traveling within the City of Gauley Bridge, Fayette County, West Virginia, at or near the intersection of U.S. Route 60 and State Route 39. As she approached the intersection, appellant Sigler encountered the parked police car of Gauley Bridge Police Officer Charles R. Burkhamer blocking her path. The police car was parked in the roadway, with blue flashing lights in use. Officer Burkhamer was the sole officer present. The officer had unilaterally decided to set up the roadblock along this roadway because there had been little law enforcement activity that evening. Officer Burkhamer, who was not wearing a reflective vest but was holding a flashlight, motioned for appellant Sigler to stop. The officer then requested that she present her driver's license, vehicle registration and proof of insurance. Officer Burkhamer detected the odor of alcohol and saw two cans of beer in the console of the truck being driven by appellant Sigler. The officer questioned appellant Sigler, who then stated that she had consumed five to six beers earlier. Officer Burkhamer requested that appellant Sigler pull to the side of the road and exit the truck. Three field sobriety tests were administered to Sigler. After Sigler failed these field sobriety tests, she was given a preliminary breath test. Appellant Sigler was then driven to Fayetteville where a secondary test was to be administered. Appellant Sigler refused to give a sample for use in this test. After the officer determined that appellant Sigler had two previous driving under the influence convictions, Officer Burkhamer arrested appellant Sigler for third offense driving under the influence.

Appellant Sigler was subsequently indicted by the May, 2008, term of the Fayette County Grand Jury on one count of third-offense driving under the influence of alcohol, in

violation of West Virginia Code §§ 17C–5–2(d) and (k).[1]

Prior to the trial of this matter, Appellant Sigler, through her counsel, moved to suppress the all evidence obtained by the State of West Virginia pursuant to Officer Burkhamer's "safety checkpoint", which was called by counsel an "illegal road block." In his motion, counsel stated that "Defendant believes that the Officer was in fact conducting a sobriety check point and not a safety check point," and that the operation of the sobriety check point was in violation of standards promulgated by the Fayette County Sheriff's Department and the West Virginia State Police. Gauley Bridge Police Department had not promulgated any regulations, policies or procedures governing sobriety or other checkpoints. The motion stated that the arresting officer failed to have flares, appropriate lighting or signs notifying drivers of the stop, and that the officer was acting outside the scope of his authority in calling the road block a safety check when in fact, it was a sobriety check point.

The State of West Virginia responded that the checkpoint was not placed in an area intended to intimidate motorists and that the stops were uniformly conducted, with all vehicles passing the checkpoint were stopped in a "minimally intrusive manner." The State's response also indicated that the checkpoint was being conducted in such a manner consistent with prior Supreme Court rulings on the issue.

On July 10, 2008, the circuit court commenced a hearing on appellant Sigler's motion to suppress. In its order dated August 6, 2008, denying the motion to suppress, the circuit court made the following findings:

1. On January 27, 2008, in Gauley Bridge, Fayette County, West Virginia, Patrolman C.L. Burkhamer, a non-certified officer at the time, set up a safety road check, which has been done seven (7) or eight (8) times before.

2. The road check was on Route 60/39 with marked curves with lights and a flashlight.

3. From 3:00 a.m. until 3:22 a.m. all cars passing through the intersection were stopped at the intersection including the defendant's car.

4. The police officer did not issue any citations on the night in question.

5. There were two (2) other ways around the road check.

6. Patrolman Burkhamer asked the defendant for her driver's license, registration and proof of insurance.

7. The officer was generally authorized by the Chief of Police to conduct the road checks, but had no specific authority to conduct this particular road check.

8. Road checks were being conducted because nothing was going on in town.

1. While this section was amended effective June 7, 2008, to reduce the applicable blood alcohol concentration to .08 of one percent of body weight, at the time of Sigler's indictment W. Va.Code § 17C–5–2(d) stated as follows:

d) Any person who:
(1) Drives a vehicle in this state while he or she:
(A) Is under the influence of alcohol; or
(B) Is under the influence of any controlled substance; or
(C) Is under the influence of any other drug; or
(D) I sunder the combined influence of alcohol and any controlled substance or any other drug; or
(E) Has an alcohol concentration in his or her blood of ten hundredths of one percent or more, by weight;
(2) Is guilty of a misdemeanor and, upon conviction thereof, shall be confined in the county or regional jail for not less than one day nor more than six months, which jail term is to include actual confinement of not less than twenty-four hours, and shall be fined not less than one hundred dollars nor more than five hundred dollars.

W. Va.Code § 17C–5–2(k) contains the enhanced penalty for the third or more offense of driving under the influence and states as follows:
(k) A person violating any provision of subsection (b), (c), (d), (e), (f), (g) or (I) of this section, for the third or any subsequent offense under this section, is guilty of a felony and, upon conviction thereof, shall be imprisoned in a state correctional facility for not less than one nor more than three years, and the court may, in its discretion, impose a fine of not less than three thousand dollars nor more than five thousand dollars.

9. The police officer did not know the defendant

10. Upon smelling alcohol on the defendant's person, Patrolman Burkhamer did a field sobriety test and the defendant was arrested.

11. Patrolman Burkhamer knows the difference between a safety check and a DUI road block.

12. According to *State v. Davis*[] 195 W.Va. 79 [464 S.E.2d 598] (1995), *Carte v. Cline*, 194 W.Va. 233 [460 S.E.2d 48] (1995) and *State v. Frisby*, 161 W.Va. 734 [245 S.E.2d 622] (1978), the Court sees clear distinction between a DUI road block and a safety check.

13. The factual situation is covered by Davis.

14. The stop was random, non-discriminatory and non-excessive.

The State and appellant Sigler entered into a plea agreement, in which Sigler agreed to plead guilty to the felony offense of third offense driving under the influence. The State agreed to stand silent at the sentencing phase. Appellant Sigler specifically reserved the right the appeal the circuit court's adverse ruling regarding her motion to suppress evidence arising from the road block. By order entered August 15, 2008, appellant Sigler was convicted of this offense. Sentencing of Sigler was deferred in this order until the conclusion of the present appeal. On December 30, 2008, this Court accepted the petition for appeal and consolidated it with the Mullens' appeal for argument, decision and opinion.

### B. John R. Mullens

John R. Mullens was arrested on September 28, 2007, for first-offense driving under the influence after he was stopped in what was termed an "administrative road check" by Fayette County deputies. Following a two-day bench trial in Magistrate Court, ap-

pellant Mullens was convicted of the offense of driving under the influence on November 29, 2007. Appellant Mullens timely appealed this conviction to the Circuit Court of Fayette County, West Virginia. The facts and circumstances [2] of his arrest are as follows:

John R. Mullens was arrested for driving under the influence at about 8 p.m. on September 28, 2007, in Fayette County, West Virginia, in violation of West Virginia Code § 17C–5–2 (year). The arresting officer, Fayette County Deputy Sheriff P.J. McCutcheon, stopped appellant Mullens as part of what he stated was a checkpoint for "administrative checks." Deputy McCutcheon testified that "an administrative check is just a check for registration, proof of insurance and driver's license."

Regarding the establishment of the roadblock, the parties agreed that at the beginning of afternoon shift, Fayette County deputy sheriffs met at the Fayette County Field Office and decided to conduct what they called a traffic check, to begin at 5 p.m. on that evening (September 29, 2007). The operation, designated by the deputies as an administrative road check disbanded and resumed several times throughout the night as the deputies were needed to respond to other emergency calls. During the time period between 10:10 p.m. to 10:45 p.m. that evening, three vehicles passed through the road block, one traveling east to west, the others traveling west to east.

The parties agreed that as the appellant Mullens, who was driving a 2003 Jeep Wrangler approached the split of Ames Heights Road, Possum Creek Road and Burma Road, he encountered two human figures in the middle of the roadway, right in front of the former convenience/grocery store. This area was one-half mile from Class VI River Runner's and a restaurant known as Smokey's on the Gorge. Appellant Mullens noted that each person was holding a flashlight and

---

**2.** The facts and circumstances of the Mullens' case are largely undisputed. For the purpose of appellant Mullens' appeal of his DUI conviction in Fayette County Magistrate Court to Fayette County Circuit Court, the State of West Virginia and appellant Mullens agreed to certain Findings of Fact, which were memorialized in a document

entitled "Agreed Findings of Fact" and filed on February 15, 2008. Left pending was the determination of whether there was probable cause to stop Mullens' vehicle. Unless otherwise noted, the facts contained in this section come from that document.

each was wearing police uniforms, but neither had on bright orange reflective safety vests that officers ordinarily wear in traffic situations. There was no roadside sign indicating the existence of a safety or administrative check or requesting that vehicles stop. There were no roadside flares in use or other cautionary lights to indicate that traffic needed to stop. Located in the store's parking lot was a Fayette County Sheriff's police cruiser, which did not have its emergency blue lights in use.

Appellant Mullens stopped and was approached by Deputy Sheriff Steven L. Yarber, Jr. The deputy pressed his torso against the driver's door of the car, and requested that Mullens produce his driver's license, vehicle registration and proof of insurance. Mullens complied with the request. The parties agree that the state inspection sticker, registration and license were current and up-to-date. The parties also agree that there were no mechanical defects, such as a burnt-out headlight, taillights or other malfunction apparent. Despite the good working order of the equipment on the vehicle, Deputy Yarber requested that appellant Mullens pull into the parking lot. Appellant Mullens was asked to exit the vehicle and complied with the demand. Deputy Yarber asked the appellant Mullens whether he had been drinking. Mullens replied "Not really." Deputy Yarber then responded, "Either you have or you haven't. Which is it? It doesn't really matter, I can smell alcohol. I'm going to do a sobriety test." The criminal complaint filed by the arresting officer indicates that appellant Mullens failed a preliminary breath test and after completing a secondary breath test, his blood alcohol content registered at .161.

The record reflects that in effect at the time of appellant Mullens' arrest were certain Sobriety Checkpoint Policies and Procedures. Promulgated by the Fayette County Sheriff's Department and issued on March 10, 2003, these policies and procedures state that in the "Policy Statement" section:

> ... Since the deployment and use of sobriety checkpoints has been found to be an effective means of achieving the goal of counteracting the problems of alcohol related traffic accidents, the Fayette County Sheriff's Department has promulgated this directive for the purpose of establishing procedures for the operation of sobriety checkpoints in a safe, efficient and legal manner ...
>
> Sobriety checkpoints conducted by the Fayette County Sheriff's Department will not be used as a subterfuge to search for evidence of other crimes. However, any officer may initiate appropriate enforcement action for any violations that are detected while conducting a sobriety checkpoint ...

The Fayette County Sheriff's Department's sobriety checkpoint procedures detail how the site should be selected. Site selection must be made in advance of establishing the checkpoint, with a site drawing being made for each site selected showing locations of warning signs, barricades, personnel, observation areas for media and citation areas for offenders. This directive stated that the sheriff, or his or her designee, would select the site based upon the incidents of alcohol related accidents during the past 12 months, incidents of DUI arrests during the previous 12 months, proximity of drinking establishments in the general area and the ability to conduct a sobriety checkpoint safely and with minimal inconvenience to the public. Other factors to be considered as secondary criteria include the presence of adequate lighting, or the ability to supplement the lighting available, whether there is sufficient space to ensure the safety of all participants and whether there was an alternate route available for drivers choosing to avoid the sobriety checkpoint operation.

The Fayette County Sheriff's Department's Guidelines require that a sobriety checkpoint be marked with signs prior to the start of the checkpoint, with traffic cones/flashing barricades to give warning of the impending stop and with marked police cars with operating emergency lights at the checkpoint. All officers controlling traffic at the checkpoint must carry a flashlight and wear an orange or a white reflective safety vest.

Under the Fayette County Sheriff's Department's guidelines, prior notice is re-

quired to the public through the media. The guidelines also detail that at least eight officers must be present at the checkpoint to hand out informational material to all traffic passing through the checkpoint, to perform field sobriety tests, to monitor and control traffic through the checkpoint and to issue citations. The guidelines provide that eight officers is the minimum number required to be present but that additional officers may be pulled in if the officer in charge deems them necessary.

Appellant Mullens' appeal to the Circuit Court of Fayette County, West Virginia was denied by order entered February 27, 2008. On November 5, 2008, this Court accepted the petition for appeal.

## II.

### STANDARD OF REVIEW

■ The issue presented in this appeal is whether the circuit court committed error in denying appellant Sigler's and Mullens' motions to suppress the evidence arising from the road block. In Syllabus Point 1 of *State v. Lacy*, 196 W.Va. 104, 468 S.E.2d 719 (1996), we set out the standard of review of a circuit court's ruling on a motion to suppress as follows:

> When reviewing a ruling on a motion to suppress, an appellate court should construe all facts in the light most favorable to the State, as it was the prevailing party below. Because of the highly fact-specific nature of a motion to suppress, particular deference is given to the findings of the circuit court because it had the opportunity to observe the witnesses and to hear testimony on the issues. Therefore, the circuit court's factual findings are reviewed for clear error.

■ It has been further declared that "we review de novo questions of law and the circuit court's ultimate conclusion as to the constitutionality of the law enforcement action." *State v. Lilly*, 194 W.Va. 595, 600, 461 S.E.2d 101, 106 (1995).

With these standards in mind, we proceed to review each conviction.

## III.

### DISCUSSION

These cases turn on the validity of the State's use of roadblocks, termed by the State as "administrative stops," wherein law enforcement officers stop motorists under the premise that they are checking for infractions of licensing, insurance and related "administrative" laws. By their nature, such roadblocks or checkpoints are operated without individualized suspicion that a crime has been committed and as such are warrantless and without probable cause. The State contends that such stoppages are manifestly different from sobriety or DUI checkpoints, in which law enforcement officers in the field are required to follow strict guidelines with a minimum of discretion in their actions. *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 450, 110 S.Ct. 2481, 2485, 110 L.Ed.2d 412, 420 (1990).

■ While the State would have us focus on the State's claimed reasons for a stoppage in considering these appeals, which is of course important, we observe that regardless of the State's claimed rationale, a stoppage of a motor vehicle at a police checkpoint is intrusive to private citizens. Such an intrusion is by its constitutional nature a seizure. *Id.; United States v. Martinez–Fuerte*, 428 U.S. 543, 556, 96 S.Ct. 3074, 3082, 49 L.Ed.2d 1116, 1127 (1976). For the purposes of the protections afforded to the citizens of West Virginia by the United States Constitution [3] and the Constitution of West

---

**3.** U.S. Const. Amend. IV provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]"

Section 1 of the Fourteenth Amendment to the *U.S. Constitution* states:

All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

Virginia,[4] we must reconcile if the stopping of a vehicle at a so-called administrative checkpoint is any less of a seizure than the stopping of that same vehicle at a sobriety checkpoint In doing so, we are mindful that the United States Supreme Court has held that in order for a checkpoint seizure to satisfy the constitutional requirements of the Fourth Amendment, the seizure must be reasonable under the circumstances. *Whren v. United States*, 517 U.S. 806, 809, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89, 95 (1996). This reasonableness requirement is an objective standard that does not permit an inquiry into the law enforcement officers' subjective motivations. *Id.*

The United States Supreme Court has made it clear that persons stopped for any purpose at checkpoints or roadblocks set up by government officials on public roadways have been "seized" for Fourth Amendment purposes. *Sitz, supra; Martinez–Fuerte, supra.* The Supreme Court first intimated that suspicionless motor vehicle checkpoints might be constitutional in *United States v. Ortiz*, 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975), a case involving a routine stop by the United States Border Patrol at a vehicle checkpoint in Southern California. The Supreme Court held that officers could not search private vehicles at such checkpoints without consent or probable cause. *Id.*, 422 U.S. at 896–97, 95 S.Ct. at 2588–2589. Specifically, the Court found that the officers' "substantial degree of discretion in deciding which cars to search" violated the Fourth Amendment. *Id.*, 422 U.S. at 895–96, 95 S.Ct. at 2588–2589. In a concurring opinion, Chief Justice Warren Burger implored his colleagues:

I would hope that when we next deal with this problem we give greater weight to the reality that the Fourth Amendment prohibits only *"unreasonable* searches and seizures" and to the frequent admonition that reasonableness must take into account all the circumstances and balance the rights of the individual with the needs of society.

*United States v. Ortiz*, 422 U.S. 899, 900, 95 S.Ct. 2590, 45 L.Ed.2d 630 (1975) (emphasis added).

Less than one year later, in another Border Patrol case, the Supreme Court considered the reasonableness of a permanent motorist checkpoint. *Martinez–Fuerte, supra.* This time, the Court found the "stops for brief questioning routinely conducted at permanent checkpoints" to be consistent with the Fourth Amendment. *Id.*, 428 U.S. at 566, 96 S.Ct. at 3087. Balancing the privacy interests of motorists with the public interest of stopping illegal immigration, the Court concluded that the checkpoints were reasonable despite the absence of individualized suspicion. *Id.*, 428 U.S. at 562–66, 96 S.Ct. at 3087. Focusing on the effects of the seizure on motorists, the Court stated, "[t]he principal protection of Fourth Amendment rights at checkpoints lies in appropriate limitations on the scope of the stop." *Id.*, 428 U.S. at 566–67, 96 S.Ct. at 3085–3087.

Three years after *Martinez–Fuerte*, the Supreme Court again considered the legitimacy of a motorist checkpoint in *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). In *Prouse*, a police officer, without having observed any traffic violation or noticed any suspicious activity, stopped a vehicle to check the driver's license and registration. *Id.*, 440 U.S. at 650, 99 S.Ct. at 1394. The officer was not acting in accordance with any approved guidelines or policies regarding checkpoints. *Id.* During the stop, the officer smelled marijuana and confiscated marijuana that was in plain view on the floor of the car. *Id.* As in *Martinez–Fuerte*, the Court analyzed the permissibility of this "seizure" by "balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Id.*, 440 U.S. at 654, 99 S.Ct. at 1396. The Court explained that an essential purpose of the Fourth Amendment is "to impose a standard of 'reasonableness' upon the exercise of discretion" by officers in order to protect against arbitrary intrusions into the privacy of individuals. *Id.*, 440 U.S.

---

4. W. Va. Const. Article III, § 6 states: The rights of the citizens to be secure in their houses, persons, papers and effects, against unreasonable searches and seizures, shall not be violated. No warrant shall issue except upon probable cause, supported by oath or affirmation, particularly describing the place to be searched, or the person or thing to be seized.

at 653–55, 99 S.Ct. at 1395–1397. The Court went on to say:

> In those situations in which the balance of interests precludes insistence upon "some quantum of individualized suspicion," other safeguards are generally relied upon to assure that the individual's reasonable expectation of privacy is not "subject to the discretion of the official in the field."

*Id.,* 440 U.S. at 654–55, 99 S.Ct. at 1396–1397. Thus, from the beginning of its motor vehicle checkpoint jurisprudence, the United States Supreme Court has focused not on the purported purpose advanced by the State in seeking to uphold the legitimacy of a checkpoint, but rather on the intrusion to the motorist and the level of discretion afforded to the State's official in the field. The absence of a limitation on an official's discretion in the field "would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches." *Id.,* 440 U.S. at 661, 99 S.Ct. at 1400 (quoting *Terry v. Ohio,* 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, 906 (1968)).

 The same year that the Supreme Court decided *Prouse,* the Court developed a balancing test for suspicionless seizures in *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). *Brown* involved a pedestrian who was arrested for failing to identify himself when stopped by police in an area known for drug trafficking. *Id.,* 443 U.S. at 49, 99 S.Ct. at 2638. The Supreme Court overturned the conviction holding that the officers lacked reasonable suspicion to make the stop. *Id.,* 443 U.S. at 53, 99 S.Ct. at 2641. In so doing, the Court developed a balancing test to determine whether a suspicionless seizure was constitutionally permissible. The *Brown* balancing test requires courts evaluating the lawfulness of suspicionless seizures such as motor vehicle checkpoints to consider three factors: (1) the gravity of the public concern that is being addressed or served by the checkpoint; (2) the degree to which the checkpoint is likely to succeed in serving this public interest;[5] and (3) the severity with which the checkpoint interferes with individual liberty. *Id.,* 443 U.S. at 50–51, 99 S.Ct. at 2640–2641. When evaluating the degree of severity of interference, courts must consider not only the subjective intrusion determined by the potential of the checkpoint to generate fear and surprise in motorists, but also the objective intrusion into individual freedom as measured by the duration of the detention at the checkpoint and the intensity of the inspection. *Id.* As explained by the Court, the purpose in weighing these factors is to "assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field." *Id.,* 443 U.S. at 51, 99 S.Ct. at 2640.

The United States Supreme Court next considered the constitutionality of suspicionless motor vehicle checkpoints in *Sitz, supra,* wherein the Court considered the constitutionality of a highway sobriety checkpoint in Michigan. *Sitz,* 496 U.S. at 447, 110 S.Ct. at 2483 Such checkpoints were set up according to strict, predetermined guidelines which eliminated most field discretion by officers, ensured a minimal stoppage for motorists, and were designed to minimize subjective fear in motorists. *Id.*

In determining that the Michigan sobriety checkpoint was consistent with the Fourth Amendment, the Supreme Court utilized the *Brown* balancing test. In so doing, the Court balanced the State's "interest in preventing accidents caused by drunk drivers, the effectiveness of sobriety checkpoints in achieving that goal, and the level of intrusion on an individual's privacy caused by the checkpoints." *Id.,* 496 U.S. at 448–49, 110 S.Ct. at 2484. Key to the Court's upholding of the checkpoint was the use of strict predetermined guidelines and the minimal discretion of officers in the field. *Id.,* 496 U.S. at 451–53, 110 S.Ct. at 2485–2486.

Five years later, the validity of sobriety checkpoints in West Virginia was established

---

5. During Prohibition, the United States Supreme Court observed that "[i]t would be intolerable and unreasonable if a prohibition agent were authorized to stop every automobile on the chance of finding liquor...." *Carroll v. United States,* 267 U.S. 132, 153–54, 45 S.Ct. 280, 285, 69 L.Ed. 543, 551 (1925).

in Justice Fox's seminal opinion of *Carte v. Cline,* 194 W.Va. 233, 460 S.E.2d 48 (1995). In *Carte,* a driver was stopped in a sobriety checkpoint in Kanawha County in which all vehicles traveling in either direction along a certain road were stopped. Upon stopping Carte, the arresting officer requested to see his insurance, driver's license and proof of insurance. The arresting officer also detected the odor of alcohol and saw beer containers in Carte's automobile. Carte was pulled over to the side of the road, where field sobriety tests were administered. Carte failed and was arrested for driving under the influence. Carte challenged his arrest on the grounds that the sobriety checkpoint was unconstitutional and violated West Virginia Constitution.

In place at the time of Carte's arrest were "The Standard Operating Procedures of the West Virginia Department of Public Safety for Sobriety Checkpoints." All sobriety checkpoints administered at that time by officers of the West Virginia State Police were to be in compliance with these rules and regulations. The stated purpose of the sobriety checkpoints was "to deter and detect alcohol and/or drug impaired drivers; and to reduce the number of alcohol related motor vehicle accidents, fatalities and injuries." The sobriety roadblock described in *Carte* appeared to be in compliance with these extensive regulations and guidelines.

 In *Carte,* this Court cited the case of *State v. Frisby,* 161 W.Va. 734, 245 S.E.2d 622 (1978), in which we stated:

> The weight of authority is that without violating the Fourth Amendment to the Constitution of the United States or W. Va. Constitution, art. 3, § 6, motorists may be stopped for no other reason than examination of licenses and registrations when such examinations are done on a random basis pursuant to a preconceived plan, such as the stopping of every car at a checkpoint, the examination of every car on a given day with particular letter

or number group in the license, or any other nondiscriminatory procedure.

*Id.* 245 S.E.2d at 625.

 This Court found in *Carte* that

> A seizure incident to a sobriety checkpoint is a reasonable law enforcement practice under the Fourth Amendment. Moreover, we do not find sobriety checkpoints violative of any provisions of the West Virginia Constitution. Sobriety checkpoint roadblocks are constitutional when conducted within predetermined operational guidelines which minimize the intrusion on the individual and mitigate the discretion vested in police officers on the scene.

*Id.* 194 W.Va. 233 at 238, 460 S.E.2d at 53.

 In the Sigler case, there were no guidelines in place for the City of Gauley Bridge. The officer unilaterally decided create a checkpoint because there was nothing going on in town that evening that required his attention. The planning level was minimal for this type of checkpoint. There was no coordination with other members of the municipal police force or with the county sheriff. This type of stoppage highlights a motor vehicle checkpoint with nearly "unbridled discretion," akin to the type of checkpoint disfavored by the United States Supreme Court in *Prouse* as unreasonable under the Fourth Amendment. Indeed, with no significant prior planning or preconceived plan, and with the virtually limitless discretion afforded to Officer Burkhamer, the Sigler motor vehicle checkpoint completely fails the third prong relating to the State's intrusion into the freedom of the motorist of the *Brown* balancing test. Even if the checkpoint which stopped appellant Sigler had been termed a "sobriety" checkpoint, it still would have failed the *Brown* balancing test as well as our holding in *Carte.*[6]

 While there was a greater level of planning in the Mullens case, the planning

---

**6.** The importance of written regulations cannot be over-emphasized. There are significant safety concerns to the drivers, as well as the officers, involved in a sobriety checkpoint. The entire operation must appear to be a legitimate exercise of police authority, so as to minimize any fear or apprehension on the part of the public. A sufficient number of uniformed law enforcement personnel must be present to appropriately staff the operation.

was no where near that required for a sobriety checkpoint under the Fayette County Sheriff's own guidelines. As with the Sigler case, the decision to run a checkpoint appears to have been made in haste. If the checkpoint encountered by appellant Mullens had been deemed a sobriety checkpoint, the number of officers present was below the minimum required. The lighting was not sufficient. The checkpoint was inadequately marked and had inadequate signs to signify its existence. Appellant Mullens had to drive within 75 feet of the officers to even realize that they were law enforcement officers. As with Sigler, the motor vehicle checkpoint used in the Mullens case, at a minimum, failed the third prong of the *Brown* balancing test as well as our decision in *Carte*.

We furthermore disagree with the State's contention that its decision to call these roadblocks something other than sobriety checkpoints somehow tempers our "seizure" analysis. It does not. If anything, an "administrative checkpoint" is on thinner ice than is a "sobriety checkpoint." Returning to the first and second prongs of the *Brown* balancing test, the concern that someone has forgotten to renew their driver's license or that their automobile may be a month beyond its annual inspection date comes no where close to the State's interest in safeguarding the highways from drivers under the influence of illicit drugs or alcohol. We believe that the safeguards currently applicable to "sobriety checkpoints" in West Virginia under the *Carte* decision, as well as under *Brown*, is the minimum necessary for the State to engage in motor vehicle checkpoints in West Virginia under both the federal and state constitutions.

For its arguments, the State relies almost entirely on the *per curiam* decision in *State v. Davis*, 195 W.Va. 79, 464 S.E.2d 598 (1995), issued four months after this Court's decision in *Carte*, for the contention that a safety road check is somehow less intrusive than is a sobriety checkpoint. In *Davis*, a motorist was stopped in what the State called a routine road check, as opposed to a sobriety checkpoint. By terming the checkpoint a "routine road check", the State contended that less onerous protocols and standards

were required. In Davis, the circuit court found that the roadblock was a routine road check, rather than a sobriety checkpoint. The purpose of the roadblock as stated by the arresting officer was to check for the possession and validity of driver's licenses, vehicle registrations and mandatory insurance. If during "routine" stops the officers found an intoxicated driver, the officers would take appropriate action in light of that discovery.

The *Davis* court acknowledged that had the roadblock been called a sobriety checkpoint, "a more detailed scrutiny would be required." *Davis* at 84, 464 S.E.2d at 603. But because the roadblock was instead termed a "routine road check," this Court found that the circuit court's determination that the arrest of Davis was appropriate under the circumstances was correct.

Clearly the conclusion reached by the court in *Davis* falls outside the constitutional parameters for suspicionless motor vehicle checkpoints set by the United States Supreme Court and by this court in *Carte* and *Frisby*. As such, to permit the State to determine the constitutional scrutiny to which a checkpoint is measured simply by allowing the State to simply call the checkpoint a different name would be an open invitation to all forms of pretextual roadblocks. Since our holding in Davis cannot be reconciled with current constitutional protections under our federal and state constitutions, Davis is hereby overruled.

▪ We hold that a stop of a motor vehicle at a police checkpoint such as the stoppage here is intrusive to private citizens. Such an intrusion is by its constitutional nature a seizure. As in *Brown*, in evaluating the lawfulness of a suspicionless seizure such as here, we believe that a balancing of interests should be considered to determine if such a seizure is permissible under the United States Constitution and the Constitution of West Virginia and these factors should be considered: (1) the gravity of the public concern that is being addressed or served by the checkpoint; (2) the degree to which the checkpoint is likely to succeed in serving this public interest; and (3) the severity with which the checkpoint interferes with individ-

ual liberty. When evaluating the degree of severity of interference with individual liberty, West Virginia courts must consider not only the subjective intrusion determined by the potential of the checkpoint to generate fear and surprise in motorists, but also the objective intrusion into individual freedom as measured by the duration of the detention at the checkpoint and the intensity of the inspection. The court's obligation in weighing these factors is to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field.

▆▆▆▆▆ In conclusion, suspicionless checkpoint roadblocks are constitutional in West Virginia only when conducted in a random and non-discriminatory manner within predetermined written operation guidelines which minimize the State's intrusion into the freedom of the individual and which strictly limits the discretion vested in police officers at the scene.[7] The checkpoints utilized by law enforcement herein were improper and any evidence derived therefrom should have been suppressed.

### IV.

### CONCLUSION

In the Sigler matter, we reverse the order of the Fayette County Circuit Court entered August 15, 2008, convicting Linda S. Sigler, also known as Linda S. Mullins, wherein the Circuit Court of Fayette County, denied the suppression of evidence related to the Gauley Bridge roadblock, and remand this case for proceedings consistent with this opinion.

In the Mullens matter, we reverse the order of the Fayette County Circuit Court entered February 27, 2008, wherein the Circuit Court of Fayette County denied the suppression of evidence related to the Fayette County Sheriff's Department's roadblock, and remand this case for proceedings consistent with this opinion.

REVERSED and REMANDED.

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

7. In finding the motor vehicle checkpoints used herein to have been implemented improperly, we do not conclude that the use of roadblocks are *per se* improper or unconstitutional, nor do we find that the State should be precluded from the use of checkpoints when properly implemented. A motor vehicle checkpoint may be appropriate for any number of reasons and may be used by law enforcement personnel so long as the checkpoint comports with the Fourth and Fourteenth Amendments of the United States Constitution and Article III, Section 6 of the Constitution of West Virginia. As set forth herein, that procedure requires a balancing of the likelihood that a checkpoint will be effective to address the public

concern at issue with the severity with which the checkpoint interferes with the liberty interests and expectations of those present in the vehicles being stopped. At a minimum, such stops must be conducted randomly, in a non-discriminatory manner, for a predetermined appropriate purpose, with predetermined written operational guidelines, and with a minimum of discretion vested in the law enforcement personnel at the scene. We observe that written operational guidelines and procedures are already used for sobriety checkpoints by a number of police departments and law enforcement detachments throughout the State.