IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2015 Term

_____

No. 14-0372

_____

**FILED**
**May 13, 2015**
released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

PATRICIA S. REED, COMMISSIONER OF THE
WEST VIRGINIA DIVISION OF MOTOR VEHICLES,
Petitioner Below, Petitioner

v.

JAMES PETTIT,
Respondent Below, Respondent

_____

Appeal from the Circuit Court of Kanawha County
Honorable Carrie L. Webster, Judge
Civil Action No. 12-AA-54

REVERSED AND REMANDED

_____

Submitted: April 7, 2015
Filed:  May 13, 2015

Patrick Morrisey, Esq.                          Michael R. Whitt, Esq.
Attorney General                                Lewisburg, West Virginia
Elaine L. Skorich, Esq.                         Attorney for Respondent
Assistant Attorney General
Charleston, West Virginia
Attorneys for Petitioner

JUSTICE BENJAMIN delivered the Opinion of the Court.
CHIEF JUSTICE WORKMAN, deeming herself disqualified, did not participate in the decision in this case.
JUDGE FERGUSON sitting by temporary assignment.
JUSTICE DAVIS dissents and reserves the right to file a dissenting opinion.

SYLLABUS BY THE COURT

1.      "On appeal of an administrative order from a circuit court, this Court is bound by the statutory standards contained in W. Va. Code § 29A-5-4(a) and reviews questions of law presented *de novo*; findings of fact by the administrative officer are accorded deference unless the reviewing court believes the findings to be clearly wrong." Syl. pt. 1, *Muscatell v. Cline*, 196 W. Va. 588, 474 S.E.2d 518 (1996).

2.      "Sobriety checkpoint roadblocks are constitutional when conducted within predetermined operational guidelines which minimize the intrusion on the individual and mitigate the discretion vested in police officers at the scene." Syl. pt. 1, *Carte v. Cline*, 194 W. Va. 233, 460 S.E.2d 48 (1995).

3.      "The essential purpose of the Fourth Amendment is 'to impose a standard of "reasonableness" upon the exercise of discretion' by officers in order to protect against arbitrary intrusions into the privacy of individuals. *Delaware v. Prouse*, 440 U.S. 648, 653-55, 99 S.Ct. 1391, 1395-97, 59 L.Ed.2d 660 (1979)." Syl. pt. 5, *State v. Sigler*, 224 W. Va. 608, 687 S.E.2d 391 (2009).

4.      "In evaluating the lawfulness of a suspicionless seizure, a balancing of interests should be considered to determine if such a seizure is permissible under the United States Constitution and the Constitution of West Virginia and [ ] these factors

i

should be considered: (1) the gravity of the public concern that is being addressed or served by the checkpoint; (2) the degree to which the checkpoint is likely to succeed in serving this public interest; and (3) the severity with which the checkpoint interferes with individual liberty." Syl. pt. 6, *State v. Sigler*, 224 W. Va. 608, 687 S.E.2d 391 (2009).

5.      "When evaluating the degree of severity of interference with individual liberty, West Virginia courts must consider not only the subjective intrusion determined by the potential of the checkpoint to generate fear and surprise in motorists, but also the objective intrusion into individual freedom as measured by the duration of the detention at the checkpoint and the intensity of the inspection." Syl. pt. 7, *State v. Sigler*, 224 W. Va. 608, 687 S.E.2d 391 (2009).

6.      "The court's obligation in weighing these factors is to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field." Syl. pt. 8, *State v. Sigler*, 224 W. Va. 608, 687 S.E.2d 391 (2009).

7.      "Suspicionless checkpoint roadblocks are constitutional in West Virginia only when conducted in a random and non-discriminatory manner within predetermined written operation guidelines which minimize the State's intrusion into the freedom of the individual and which strictly limits the discretion vested in police officers at the scene." Syl. pt. 9, *State v. Sigler*, 224 W. Va. 608, 687 S.E.2d 391 (2009).

Benjamin, Justice:

Petitioner Patricia S. Reed, Commissioner of the West Virginia Division of Motor Vehicles ("DMV"),[1] appeals the March 20, 2014, order of the Circuit Court of Kanawha County. The circuit court's order affirmed the order of the Office of Administrative Hearings ("OAH"), which reversed the DMV's order of revocation revoking the driver's license of Respondent James Pettit for the offense of driving under the influence of alcohol ("DUI"). Upon consideration of the parties' briefs, the record presented, and the oral argument, this Court concludes that the circuit court erred in finding that Mr. Pettit's arrest was unlawful and by reinstating his driver's license. Therefore, we reverse the circuit court's order, and we remand for reinstatement of the DMV's revocation order.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The White Sulphur Springs Police Department in Greenbrier County, West Virginia, scheduled a sobriety checkpoint to be held on October 16, 2010, between 8 p.m. and 2 a.m. on U.S. Route 60 West in Harts Run in Greenbrier County. The guidelines governing the operation of sobriety checkpoints are set forth in the police department's "DUI Sobriety Checkpoint Operations Manual" ("Manual"). Pursuant to the Manual, the

---

[1] While this case was pending before the Court, Patricia S. Reed replaced Steven O. Dale as Commissioner of the West Virginia Division of Motor Vehicles. Pursuant to Rule 41(c) of the West Virginia Rules of Appellate Procedure, the name of the current public officer has been substituted accordingly in this action.

scheduled checkpoint was announced in the local newspaper. However, in violation of the Manual, the Greenbrier County Prosecutor's Office was not contacted for inclusion in the checkpoint planning.

On October 16, 2010, the Chief of Police of White Sulphur Springs, James Lee Hylton, who was the officer in charge of the checkpoint, moved the checkpoint to U.S. Route 60 East in White Sulphur Springs, a distance of approximately three and one-half to four miles from the originally scheduled location. Chief Hylton testified before the OAH that he moved the location closer to town because of a shortage of available police officers. He explained that because the majority of police calls come from the town, a police officer working the DUI checkpoint in town could more quickly answer a police call. Finally, while the Manual requires six officers to work a sobriety checkpoint plus one officer in charge for a total of seven officers, because the police department was shorthanded at the time, only four officers and one officer in charge actually worked the checkpoint at issue.

Corporal J. W. Hopkins, the investigating officer below, was working at the checkpoint when he encountered Respondent James Pettit. After observing that Mr. Pettit's speech was slurred and his eyes were glassy, Corporal Hopkins asked him if he had been drinking, and Mr. Pettit replied that he had consumed alcohol at home and at a bar. Consequently, Corporal Hopkins administered a series of field sobriety tests. Corporal Hopkins testified before the OAH that Mr. Pettit failed the walk-and-turn, the

one-leg stand, and the horizontal gaze nystagmus tests.[2] Corporal Hopkins further testified that he administered a preliminary breath test which Mr. Pettit failed. According to Corporal Hopkins, he then transported Mr. Pettit to the Greenbrier County Sheriff's Department where he administered a secondary chemical test of Mr. Pettit's breath. The result of the test indicated that Mr. Pettit's blood alcohol content was .157.

By order dated November 16, 2010, the DMV revoked Mr. Pettit's privilege to operate a motor vehicle in this State based on his DUI. Mr. Pettit appealed the revocation, and after a hearing before the OAH, the OAH reversed Mr. Pettit's driver's license revocation. The OAH found that the sobriety checkpoint at issue deviated from the police department's Manual and that these deviations rendered Mr. Pettit's arrest unlawful. Specifically, the OAH found that the Chief of Police did not have the Prosecuting Attorney approve the checkpoint as mandated by the Manual. In addition, the checkpoint was moved from its originally scheduled location without notice to the public. Finally, while the Manual calls for six officers and one officer in charge to be assigned to work a sobriety checkpoint, only four officers and one officer in charge worked the checkpoint at issue.

---

[2] The OAH indicated in its order that the results of the horizontal gaze nystagmus test were not considered because Corporal Hopkins did not perform a medical assessment prior to administering the test.

3

The DMV appealed the OAH's decision to the Circuit Court of Kanawha County. By order dated March 20, 2014, the circuit court affirmed the decision of the OAH. The DMV now appeals the circuit court's order.

## II. STANDARD OF REVIEW

This Court set forth the standard of review dealing with driver's license revocations in syllabus point 1 of *Muscatell v. Cline*, 196 W. Va. 588, 474 S.E.2d 518 (1996), as follows:

> On appeal of an administrative order from a circuit court, this Court is bound by the statutory standards contained in W. Va. Code § 29A-5-4(a) and reviews questions of law presented *de novo*; findings of fact by the administrative officer are accorded deference unless the reviewing court believes the findings to be clearly wrong.

With this standard to guide us, we will now review the circuit court's decision below.

## III. ANALYSIS

In this case, we are asked to determine the lawfulness of the sobriety checkpoint at which Mr. Pettit was stopped and found to be DUI. West Virginia Code § 17C-5A-2(f) (2010), the statute in force at the time of Mr. Pettit's arrest, provided in pertinent part:

> In the case of a hearing in which a person is accused of driving a motor vehicle while under the influence of alcohol, controlled substances or drugs, or accused of driving a motor vehicle while having an alcohol concentration in the person's blood of eight hundredths of one percent or more, by weight . . . the Office of Administrative Hearings shall make specific

4

findings as to: . . . (2) whether the person was lawfully placed under arrest for an offense involving driving under the influence of alcohol, controlled substances or drugs, or was lawfully taken into custody for the purpose of administering a secondary test. . . .

According to this statute, in a case involving a license revocation due to DUI, the OAH is required to make a specific finding that the person was lawfully arrested.[3] Under this Court's precedent, a person cannot be considered lawfully arrested for DUI, as a prerequisite to the administrative revocation of the person's driver's license, unless the underlying traffic stop was legally valid. In *Dale v. Ciccone*, 233 W. Va. 652, 760 S.E.2d 466 (2014), this Court explained:

> As this Court stated in *Dale v. Odum*, 233 W. Va. 601, 760 S.E.2d 415, 2014 WL 641990 (W. Va. Feb. 11, 2014) (memorandum decision), "absent a valid investigatory stop, a finding that the ensuing arrest was lawful cannot be made." *Id.* 606, 760 S.E.2d at 420, 2014 WL 641990 at *5. This issue was also addressed in *Dale v. Arthur*, 2014 WL 1272550 (W. Va. March 28, 2014) (memorandum decision), as follows:
>
>> Our decision in *Clower v. West Virginia Department of Motor Vehicles*, 223 W. Va. 535, 544, 678 S.E.2d 41, 50 (2009), applied the 2004 version of West Virginia Code § 17C-5A-2(e) which required a specific finding of "whether the person was lawfully placed under arrest for an offense involving driving under the influence of alcohol . . . or was lawfully taken into custody for the purpose of administering a secondary test." The 2008 version of the statute

---

[3] On appeal to this Court, the DMV argues that even if the checkpoint at issue was unconstitutional, the circuit court erred in finding Mr. Pettit's arrest and his driver's license revocation unlawful. The DMV also contends that even if Mr. Pettit's arrest was unlawful, in violation of W. Va. Code § 17C-5A-2(f), the circuit court erred in creating the remedy of reinstatement of Mr. Pettit's driver's license. This Court previously addressed these arguments and found them to be without merit.

did not contain this language. *Miller v. Chenoweth*, 229 W. Va. 114, 117 n.5, 727 S.E.2d 658, 661 n.5 (2012). However, the Legislature amended the statute in 2010, and restored the language requiring a finding that the person was either lawfully arrested or lawfully taken into custody. *Id.*

2014 WL 1272550 at *3 n.2. As this Court observed in *Arthur*, "the decision to include the requirement is within the prerogative of the Legislature, and it is not to be invaded by this Court." *Id.* at *3. Consequently, in cases in which the applicable version of West Virginia Code § 17C-5A-2 has included the requirement for a lawful arrest, as it does in the case sub judice and did in *Clower*, an individual cannot be considered lawfully arrested for DUI where law enforcement did not have the requisite articulable reasonable suspicion to initiate the underlying traffic stop.

*Ciccone*, 233 W. Va. at 659, 760 S.E.2d at 473. *See also Dale v. Barnhouse*, No. 14-0056, 2014 WL 6607493 at *3 (W. Va. Nov. 21, 2014) (memorandum decision) (finding that "the investigating officer in this case did not have the requisite articulable reasonable suspicion to initiate a traffic stop and, thus, respondent was not lawfully placed under arrest"); *Dale v. Haynes*, No. 13-1327, 2014 WL 6676546 (W. Va. Nov. 21, 2014) (memorandum decision) (rejecting Commissioner's argument that an arrest can be lawful absent a valid traffic stop).

In addition, this Court previously has indicated that under W. Va. Code § 17C-5A-2(f), evidence that a person was driving while intoxicated collected incident to an unlawful arrest resulting from an unlawful stop should not be considered by the OAH or the circuit court in appeals involving driver's license revocations. In *Dale v. Arthur*,

6

No. 13-0374, 2014 WL 1272550 (W. Va. Mar. 28, 2014) (memorandum decision), we determined that the exclusion of evidence collected during an unlawful stop was proper under W. Va. Code § 17C-5A-2(f). In doing so, this Court relied on *Clower v. West Virginia Department of Motor Vehicles*, 223 W. Va. 535, 678 S.E.2d 41 (2009), *superseded by statute as stated in Miller v.* Chenoweth, 229 W. Va. 114, 727 S.E.2d 658 (2012), in which we concluded that the revocation of a driver's license was improper and did not address evidence that the motorist had slurred speech, smelled of alcohol, failed field sobriety tests, and had a blood alcohol content above the legal limit because this evidence was collected during an unlawful stop. *See also Dale v. Barnhouse*, *supra* (finding that OAH and circuit court properly did not consider evidence of driving while intoxicated where the evidence was collected during an unlawful stop); *Dale v. Judy*, No. 14-0216, 2014 WL 6607609 (W. Va. Nov. 21, 2014) (memorandum decision) (concluding that neither OAH nor the circuit court erred in not considering evidence garnered as result of invalid stop).

In the instant case, the applicable version of W. Va. Code § 17C-5A-2(f) requires that the OAH make a finding that the person was lawfully arrested. The circuit court agreed with the OAH that Mr. Pettit was not lawfully arrested because the traffic stop at which Mr. Pettit was arrested was not legally valid. Consequently, the OAH and the circuit court did not consider evidence garnered as a result of the traffic stop and reinstated Mr. Pettit's driver's license which had been revoked for DUI. The sole issue before this Court is the legal validity of the sobriety checkpoint below.

7

In *Carte v. Cline*, 194 W. Va. 233, 460 S.E.2d 48 (1995), this Court considered the constitutionality of sobriety checkpoints. At the outset, we recognized that "[f]or Fourth Amendment purposes, a 'seizure' takes place when a vehicle is stopped at a sobriety checkpoint. Such a seizure is subject to constitutional scrutiny to determine its reasonableness." 194 W. Va. at 236, 460 S.E.2d at 51. We then reviewed three leading cases of the United States Supreme Court dealing with the issue of checkpoint seizures.

The first case we reviewed in *Cline* was *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976), which involved the operation of a fixed immigration roadblock at which all passing vehicles were initially stopped and the vehicles' occupants briefly observed or questioned. Vehicles were detained only upon a finding of probable cause or the consent of the driver. The Supreme Court concluded that "the seizure incident to a fixed roadblock satisfied the reasonableness standard of the Fourth Amendment as long as the stop remained minimally intrusive and was operated pursuant to narrow guidelines which limited the discretionary authority of the officials conducting the stops." *Cline*, 194 W. Va. at 237, 460 S.E.2d at 52, (citing *Martinez-Fuerte*, 428 U.S. at 566–67).

The second case we considered was *Delaware v. Prouse*, 440 U.S. 648 (1979). In *Prouse*, a police officer randomly stopped a car to check the driver's license and registration despite the fact that the officer had no reason for stopping the car such as witnessing a traffic violation or suspicious activity. The officer then saw marijuana in

plain view on the floor of the car and arrested the driver for illegal possession of a controlled substance. The Supreme Court held that the stop was unreasonable and in violation of the Fourth Amendment for two reasons: the police officer's unbridled discretion in conducting the stop and the Supreme Court's determination that any slight benefit to highway safety did not justify the Fourth Amendment intrusion.

The third case that we examined in *Cline* was *Michigan Department of State Police v. Sitz*, 496 U.S. 444 (1990), in which the Supreme Court squarely addressed the issue of whether a State's use of sobriety checkpoints violates the Fourth and Fourteenth Amendments to the United States Constitution. The specific checkpoint at issue was conducted in Michigan. The Court in *Sitz* indicated that a Michigan advisory committee created guidelines setting forth procedures governing checkpoint operations, site selection, and publicity. Under these guidelines, all vehicles passing through a checkpoint were stopped and their drivers briefly examined for signs of intoxication. The *Sitz* court emphasized that the "checkpoints are selected pursuant to the guidelines, and uniformed police officers stop every approaching vehicle." 496 U.S. at 453.

The Supreme Court utilized a balancing test in determining the constitutionality of sobriety checkpoints. On one side of the scale, the Supreme Court placed a State's interest in conducting sobriety checkpoints and found that "[n]o one can seriously dispute the magnitude of the drunken driving problem or the States' interest in eradicating it." 496 U.S. at 450–51. On the other side of the scale, the Supreme Court

placed the Fourth Amendment intrusion caused by checkpoints and found that the measure of the intrusion on motorists stopped briefly at sobriety checkpoints is slight, noting that the average delay for each driver at the checkpoint at issue was 25 seconds. The Supreme Court explained that "[i]n *Delaware v. Prouse, supra,* we disapproved random stops made by Delaware Highway Patrol officers in an effort to apprehend unlicensed drivers and unsafe vehicles," 496 U.S. at 454, because such "stops involved the 'kind of standardless and unconstrained discretion [which] is the evil the Supreme Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed, at least to some extent.'" *Id.* (Citing *Delaware*, at 659–660). This Court, based on our review of these Supreme Court cases, held in syllabus point 1 of *Cline*, *supra*, that "[s]obriety checkpoint roadblocks are constitutional when conducted within predetermined operational guidelines, which minimize the intrusion on the individual and mitigate the discretion vested in police officers at the scene."

More recently, in *State v. Sigler*, 224 W. Va. 608, 687 S.E.2d 391 (2009), this Court concluded that "the stopping of a vehicle at a so-called administrative checkpoint is . . . [no] less of a seizure than the stopping of that same vehicle at a sobriety checkpoint," *Sigler*, 224 W. Va. at 616, 687 S.E.2d at 399. In determining the validity of both types of checkpoints, we explained in syllabus point 5 of *Sigler* that

> [t]he essential purpose of the Fourth Amendment is "to impose a standard of 'reasonableness' upon the exercise of discretion" by officers in order to protect against arbitrary

10

intrusions into the privacy of individuals. *Delaware v. Prouse*, 440 U.S. 648, 653-55, 99 S.Ct. 1391, 1395-97, 59 L.Ed.2d 660 (1979).

In order to ensure that a checkpoint is reasonable, this Court held:

> In evaluating the lawfulness of a suspicionless seizure, a balancing of interests should be considered to determine if such a seizure is permissible under the United States Constitution and the Constitution of West Virginia and these factors should be considered: (1) the gravity of the public concern that is being addressed or served by the checkpoint; (2) the degree to which the checkpoint is likely to succeed in serving this public interest; and (3) the severity with which the checkpoint interferes with individual liberty.

Syl. pt. 6, *id.* Further,

> When evaluating the degree of severity of interference with individual liberty, West Virginia courts must consider not only the subjective intrusion determined by the potential of the checkpoint to generate fear and surprise in motorists, but also the objective intrusion into individual freedom as measured by the duration of the detention at the checkpoint and the intensity of the inspection.

Syl. pt. 7, *Sigler.* In addition, we observed that "[t]he court's obligation in weighing these factors is to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of the officers in the field." Syl. pt. 8, *id.* Finally, we held that

> [s]uspicionless checkpoint roadblocks are constitutional in West Virginia only when conducted in a random and non-discriminatory manner within predetermined written operation guidelines which minimize the State's intrusion into the freedom of the individual and which strictly limits the discretion vested in police officers at the scene.

Syl. pt. 9, *id.* We will now apply our law from *Cline* and *Sigler* to the facts of this case.

11

As noted above, the White Sulphur Springs Police Department had predetermined written guidelines governing the operation of sobriety checkpoints. However, the police department deviated from these guidelines when it conducted the checkpoint at issue. It is not disputed that the police department did not have the prosecuting attorney approve the checkpoint, the checkpoint was moved from its originally scheduled location without notice to the public, and only four officers and one officer in charge worked the checkpoint which was short of the six officers and one officer in charge required under the guidelines.

On appeal, the Commissioner posits that it was not necessary for the police department to follow the operational guidelines for sobriety checkpoints perfectly. Instead, says the Commissioner, this Court should apply the balancing test from *Sigler* to determine whether the police department's deviation from the manual affected the State's intrusion into Mr. Pettit's freedom and whether these deviations vested too much discretion in the officer in charge of the checkpoint. Mr. Pettit responds that if police departments are not required to adhere to their predetermined guidelines for sobriety checkpoints, these departments simply will disregard the guidelines at will. He argues that this, in turn, will result in officers in charge having unfettered discretion regarding the conduct of checkpoints and greater intrusion into the public's liberty as a result of the checkpoints.

12

As an initial matter, we find that the police department's violations of its guidelines for sobriety checkpoints did not amount to per se violations of the federal or state constitutions or other laws of this State. The Supreme Court has never held that the federal constitution requires that a county prosecutor approve a sobriety checkpoint before the checkpoint is conducted, that a checkpoint cannot be moved after it is publicly announced to be held at a specific location, or that a specific number of police officers must work a sobriety checkpoint. In addition, this Court is unaware of any statute or State rule that contains these requirements, and this Court never has held that the predetermined guidelines governing sobriety checkpoints must contain these requirements. Instead, the police department below drafted these guidelines in an attempt to ensure that its operation of a sobriety checkpoint conforms to federal and state constitutional law. Obviously, a police department may draft requirements that go beyond what is constitutionally required. In instances where a checkpoint is challenged because a police department violated a sobriety checkpoint guideline which is not mandated under state law or the state and federal constitutions, we agree with the DMV that a court must determine the lawfulness of the checkpoint by applying the balancing test which we set forth in *Sigler.*

In *Sigler* this Court observed that in assessing the lawfulness of checkpoints we principally are concerned with the reasonableness both of the degree of discretion exercised by police officers in operating the checkpoint and the intrusion into the privacy of individuals who are stopped at the checkpoint. Therefore, the question that we must

13

answer in this case is whether the Police Department's violation of its predetermined guidelines resulted in the officers operating the checkpoint exercising an unreasonable degree of discretion or an unreasonable interference with the liberty of motorists passing through the checkpoint.

After careful consideration and application of our law to the specific facts of this case, we find that the police department's deviation from its predetermined guidelines in the operation of the checkpoint at issue did not result in the unreasonable exercise of discretion by the officer in charge of the checkpoint. The evidence indicates that the officer in charge planned the sobriety checkpoint in advance in substantial compliance with the predetermined guidelines. These facts are in marked contrast to those of *Prouse* in which an officer in the field acted in his or her own discretion in setting up and conducting a checkpoint as he or she saw fit.

Further, the officer in charge in the instant case articulated a specific, reasonable explanation for moving the checkpoint prior to it being moved. The guidelines provide that an alternate checkpoint can be used "if a hazardous or otherwise unsafe condition exists as determined by the supervisor in charge." The officer in charge specifically testified below that he moved the checkpoint into town because he was short of police officers, and the alternate location made it easier for a police officer working the checkpoint to respond to a police call which was more likely to originate inside the town.

14

Therefore, the relocation of the sobriety checkpoint for the purpose of providing sufficient protection to and safety of the general public conformed to the guidelines.

Moreover, the officer in charge explained that fewer officers worked the checkpoint than the guidelines require because one of his officers recently had resigned. There is no evidence that the decreased number of officers operating the checkpoint increased the degree of discretion that these officers exercised or that they failed to operate the checkpoint in a random and nondiscriminatory manner.

Finally, there was no evidence presented below that the operation of the checkpoint at issue resulted in an unreasonable intrusion into the freedom of individual motorists who passed through the checkpoint. Specifically, Chief Hylton, the officer in charge, testified before the OAH that signs were posted at the site to alert motorists about the checkpoint. He also indicated that at least four emergency vehicles were at the scene and at least three of them had their emergency lights on. Further, Chief Hylton indicated that all of the officers working the checkpoint had flashlights and were wearing what he called "five point vests." This indicates to this Court that the checkpoint was not operated in such a way as to have a significant potential to generate fear and surprise in motorists. Finally, Officer Jerry W. Hopkins, who arrested Mr. Pettit, testified below that his duties at the sobriety checkpoint were to check for impaired drivers, insurance information, and registration. Based on this evidence, this Court has no reason to conclude that the

15

duration of the detention of each individual motorist and the intensity of the inspection of each motorist was unreasonable.

## IV.  CONCLUSION

Based on our analysis above, this Court finds that the sobriety checkpoint at issue was legally valid and that Mr. Pettit's arrest for DUI was lawful. Accordingly, we reverse the March 20, 2014, order of the Circuit Court of Kanawha County that affirmed the OAH's reversal of Mr. Pettit's driver's license revocation, and we remand for the reinstatement of the revocation.

Reversed and remanded.